[This opinion has been published in *Ohio Official Reports* at 68 Ohio St.3d 570.]

REID, JOHNSON, DOWNES, ANDRACHIK & WEBSTER, APPELLEE, *v.* LANSBERRY,
APPELLANT.

[Cite as *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry*,
1994-Ohio-512.]

*Attorneys at law—Client has absolute right to discharge law firm subject to obligation to compensate firm for services rendered—Contingent-fee agreement—Discharged law firm's cause of action for fee recovery on basis of quantum meruit arises, when—Factors trial court should consider in determining reasonable value of discharged contingent-fee firm's services.*

1.  A client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject to the obligation to compensate the attorney or firm for services rendered prior to the discharge.

2.  When an attorney representing a client pursuant to a contingent-fee agreement is discharged, the attorney's cause of action for a fee recovery on the basis of *quantum meruit* arises upon the successful occurrence of the contingency.

3.  A trial court called upon to determine the reasonable value of a discharged contingent-fee attorney's services in *quantum meruit* should consider the totality of the circumstances involved in the situation. The number of hours worked by the attorney before the discharge is only one factor to be considered. Additional relevant considerations include the recovery sought, the skill demanded, the results obtained, and the attorney-client agreement itself.

(No. 92-2013—Submitted December 7, 1993—Decided March 30, 1994.)

APPEAL from the Court of Appeals for Summit County, No. 15449.

_____

{¶ 1} In October 1984, defendant-appellant Donald Lansberry was injured in a motor vehicle accident. In December of that year, he and his wife entered into a contingent-fee-representation agreement with plaintiff-appellee, the law firm of Reid, Johnson, Downes, Andrachik & Webster ("Reid, Johnson"). In late May or early June 1986, William A. LeFaiver, a salaried attorney with Reid, Johnson who had been working on the Lansberrys' case, ceased affiliation with the law firm. On August 27, 1986, the Lansberrys signed a contingent-fee-representation contract with LeFaiver. This contract did not mention the previous representation agreement signed with the law firm. In August and September 1986, the Lansberrys sent three letters to Reid, Johnson, all of which advised the law firm that the Lansberrys considered LeFaiver (not the law firm) to be their attorney. The first two letters essentially proposed that LeFaiver and Reid, Johnson jointly represent the Lansberrys. In the third letter, the Lansberrys reiterated that LeFaiver was their attorney, and clearly informed Reid, Johnson that the firm was to cease representing them. In all three letters, the Lansberrys asked that Reid, Johnson forward their file immediately to LeFaiver.

{¶ 2} On or about September 16, 1986, Reid, Johnson filed a complaint (which the Lansberrys contend was filed without their permission) on behalf of the Lansberrys in common pleas court. The law firm notified the Lansberrys by a letter dated September 25, 1986, that the Lansberrys' file would not be released to LeFaiver until two conditions were met: (1) payment of expenses incurred by the firm relating to the matter, and (2) payment to the firm of one-third of any settlement reached or judgment achieved in the matter. In October 1986, LeFaiver sent two letters to Reid, Johnson requesting that the Lansberrys' file be sent immediately to him.

{¶ 3} By October 8, 1986, Reid, Johnson had received a settlement offer of $65,000 from the insurance company of the other driver involved in the accident. The law firm advised LeFaiver that the Lansberrys' file would be released upon

2

payment of expenses advanced by Reid, Johnson, and upon receipt by the firm of a written guaranty of payment for one-third of $65,000 executed by Donald Lansberry. On October 20, 1986, the Lansberrys executed a guaranty to pay Reid, Johnson $21,666.67 upon recovery of an amount equal to or greater than $65,000, in return for the release of the Lansberrys' file to LeFaiver.

{¶ 4} In December 1989, Reid, Johnson filed suit against Donald Lansberry in the Summit County Court of Common Pleas, seeking to enforce the guaranty. In the complaint, the law firm alleged that Lansberry's personal-injury case had been settled, that the disputed amount had been placed in an escrow account following the settlement, and that the firm was entitled to recover $21,666.67 plus interest. Reid, Johnson apparently dropped its claim for recovery of expenses advanced by the firm on behalf of the Lansberrys. In his answer, Lansberry denied that Reid, Johnson was entitled to the money in the escrow account, and alleged that the law firm was entitled to an amount not to exceed $2,500. Lansberry claimed that Reid, Johnson spent less than twenty hours on Lansberry's case prior to being discharged as Lansberry's attorney, and that the reasonable value of Reid, Johnson's services was $125 per hour. Lansberry argued that $2,500 was the *quantum meruit* measure of the total value of the law firm's services.

{¶ 5} Reid, Johnson's motion for summary judgment was denied by the trial court, which referred the case to a referee for a determination of damages in *quantum meruit* pursuant to *Fox & Associates Co., L.P.A. v. Purdon* (1989), 44 Ohio St.3d 69, 541 N.E.2d 448.

{¶ 6} The referee, after observing that Lansberry had received approximately $94,000 in settlement of his claim, recommended that Reid, Johnson receive the $21,666.67 plus interest contained in the escrow account. Focusing on the circumstances surrounding the October 20, 1986 payment guaranty signed by the Lansberrys, the referee recommended that the guaranty should be enforced. Specifically, the referee found that the Lansberrys had signed the guaranty under

no duress from the law firm, and that the document was signed in order "to trick [Reid, Johnson] into releasing the file, based upon the promise of [the Lansberrys] to pay the $21,666.67 set forth therein." The referee apparently found the *Fox* case inapplicable to the facts as he determined them, as no citation to *Fox* appears in the referee's order and recommendation. The referee found that Lansberry's contention that Reid, Johnson had put in about twenty hours of work with a value of $125 per hour was supported by the record, but recommended that the firm's recovery should not be limited to a *quantum meruit* award in that amount.

{¶ 7} The trial court accepted the referee's report in part, but determined that the referee had not applied the applicable rule of law to the facts as the referee determined them. Stating that it was apparent from the referee's report that Lansberry had discharged the law firm prior to resolution of his personal-injury matter, the trial court essentially determined that neither the Lansberrys' contingent-fee agreement with the firm, nor the later payment guaranty modifying that agreement, was enforceable. In so ruling, the trial court referred to *Fox* for the proposition that when an attorney is discharged by a client without cause prior to final resolution of the case (or prior to substantial performance), the discharged attorney may recover only the reasonable value of services rendered prior to the discharge on the basis of *quantum meruit*. See *Fox*, 44 Ohio St.3d 69, 541 N.E.2d 448, at syllabus. Applying that principle of *Fox*, the trial court awarded Reid, Johnson $2,500 as the reasonable value of services rendered prior to discharge by the Lansberrys, and ordered the remainder of the funds in the escrow account disbursed to Donald Lansberry.

{¶ 8} On appeal, the Court of Appeals for Summit County reversed the judgment of the trial court. The court of appeals found *Fox* inapplicable to the facts before it: "*Fox* holds that where an attorney is discharged by a client, with or without just cause, the attorney is only entitled to recover the reasonable value of services rendered prior to the discharge based on *quantum meruit*, rather than

damages based on the contingent fee contract. In the present case, the clients discharged the law firm in September 1986, subjecting them to a claim by the firm for fees based on *quantum meruit*, according to *Fox*. However, since they thereafter entered into a new guaranty contract, upon the advise [*sic*] of attorney LeFavier [*sic*], *Fox* does not preclude its enforcement." Thus, consistent with the recommendation of the referee, the court of appeals determined that the payment guaranty was enforceable.

{¶ 9} The cause is now before this court pursuant to the allowance of a motion to certify the record.

––––––––––––––––––

*Reid, Berry & Stanard* and *Timothy T. Reid*, for appellee.

*Kevin E. Brown*, for appellant.

––––––––––––––––––

**ALICE ROBIE RESNICK, J.**

{¶ 10} In *Fox & Associates Co., L.P.A. v. Purdon* (1989), 44 Ohio St.3d 69, 541 N.E.2d 448, syllabus, this court held: "When an attorney is discharged by a client with or without just cause, and whether the contract between the attorney and client is express or implied, the attorney is entitled to recover the reasonable value of services rendered the client prior to discharge on the basis of *quantum meruit*. (*Scheinesohn v. Lemonek* [1911], 84 Ohio St. 424, 95 N.E. 913, and *Roberts v. Montgomery* [1926], 115 Ohio St. 502, 154 N.E. 740, overruled.)" Thus, pursuant to *Fox*, even if an attorney is discharged without cause, and even if a contingent fee agreement is in effect at the time of the discharge, the discharged attorney recovers on the basis of *quantum meruit*,[1] and not pursuant to the terms of the agreement.

––––––––––––––––––

1. "*Quantum meruit*" means literally "as much as deserved." See Black's Law Dictionary (6 Ed.1990) 1243 (The equitable doctrine of *quantum meruit* is based on an implied "promise on the part of the defendant to pay the plaintiff *as much as he* reasonably *deserved* to have for his labor." [Emphasis *sic*.]).

**{¶ 11}** *Fox* overruled several precedents, *Scheinesohn*, *supra*, and *Roberts*, *supra*, which had held that when a contingent-fee contract is breached by a client without just cause, the measure of damages is the full contract price, not the reasonable value of services rendered by the attorney prior to being discharged by the client. This court in *Fox*, by limiting a discharged attorney to a *quantum meruit* recovery, abandoned the so-called "traditional rule," now followed in a small minority of jurisdictions, in favor of a new emerging majority rule. See Sloan, Quantum Meruit: Residual Equity in Law (1992), 42 De Paul L.Rev. 399, 439 (rule in most jurisdictions today is that discharged attorney may recover "*only* on a quantum meruit basis" [emphasis *sic*]). See, generally, Annotation, Limitation to Quantum Meruit Recovery, Where Attorney Employed Under Contingent Fee Contract Is Discharged Without Cause (1979), 92 A.L.R.3d 690.

**{¶ 12}** The *quantum meruit* rule adopted by the court in *Fox* "strikes the proper balance by providing clients greater freedom in substituting counsel, and in promoting confidence in the legal profession while protecting the attorney's right to be compensated for services rendered." 44 Ohio St.3d at 72, 541 N.E.2d at 450. See *Fracasse v. Brent* (1972), 6 Cal.3d 784, 792, 100 Cal. Rptr. 385, 390, 494 P.2d 9, 14; *Rosenberg v. Levin* (Fla.1982), 409 So.2d 1016, 1020.

**{¶ 13}** One of the central tenets of the *Fox* approach is that a client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject to the obligation to compensate the attorney or firm for services rendered prior to the discharge. See 44 Ohio St.3d at 72, 541 N.E.2d at 450. Cf. Model Rules of Professional Conduct (1992), Rule 1.16, Comment at 57 ("A client has a right to discharge a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services."). See *Rosenberg*, *supra*, 409 So.2d at 1020 (*quantum meruit* recovery limitation is necessary to avoid placing restrictions on client's right to discharge attorney). Once discharged, the attorney must withdraw from the case, and can no longer recover on the contingent-fee-

representation agreement. The discharged attorney may then pursue a recovery on the basis of *quantum meruit* for the reasonable value of services rendered up to the time of discharge.

{¶ 14} The record indicates that appellant informed appellee several times that LeFaiver, and not appellee, was his attorney. Appellant repeatedly asked appellee to send his file to LeFaiver. Although appellant did not explicitly discharge appellee as his attorney in the first two letters he sent the law firm (proposing that appellee participate in a sort of co-representation with LeFaiver), the third letter clearly conveys appellant's desire to discharge appellee. In that letter, appellant unequivocally told appellee to cease representing him. The record supports the observation made by the court of appeals that appellant discharged appellee as his attorney, and that application of the rule of *Fox* would limit appellee to a recovery in *quantum meruit*.

{¶ 15} However, the record does not support the court of appeals' further determination that the guaranty contract subsequently signed by appellant with the law firm after he discharged it means that *Fox* does not control this case. DR 2-110(B)(4) requires that "a lawyer representing a client *** *shall* withdraw from employment if: *** [h]e is discharged by his client." (Emphasis added.) Along with the mandatory obligation to withdraw from a case when discharged, an attorney who is discharged must yield the case file. At the time appellant discharged the law firm, the firm was *required* to return his case file to him, and to cease any and all involvement in the case. Yet the record unquestionably reveals that appellee refused to give appellant the file and even took the additional step of conditioning release of the file upon appellant's execution of a guaranty modifying the prior contingent-fee agreement.

{¶ 16} Although appellant was not actually under duress (as the term is strictly defined) when he signed the guaranty, for all practical purposes he was made to sign the guaranty it to obtain the file. Since appellee should not have

imposed that condition on appellant to obtain the file once discharged, the guaranty is not enforceable, and this case does come within the rule of *Fox*. As in *Fox*, "[t]he law firm was discharged, and \*\*\* the maximum reach of its right to fees, with regard to the client, is the reasonable value of the legal services actually rendered to the date of discharge."[2]  44 Ohio St.3d at 72, 541 N.E.2d at 450.

{¶ 17} Having determined that appellee's recovery from appellant should be determined according to the equitable doctrine of *quantum meruit*, we address how the amount of recovery should be measured.

{¶ 18} As an initial matter, we join those jurisdictions which have held that when an attorney representing a client pursuant to a contingent-fee agreement is discharged, the attorney's cause of action for a fee recovery on the basis of *quantum meruit* arises upon the successful occurrence of the contingency.  Under this approach, in most situations the discharged attorney is not compensated if the client recovers nothing.

{¶ 19} The California Supreme Court, in Fracasse, supra, 6 Cal.3d at 792, 100 Cal.Rptr. at 390, 494 P.2d at 14, gave two reasons for adopting this holding. First, the amount involved and the result obtained, two significant considerations in deciding whether an attorney fee is reasonable, cannot be determined until the contingency occurs.  Second, a client of limited means, for whom the contingent-fee agreement is the only real hope of recovering an award, would be improperly burdened by an absolute obligation to pay his or her former attorney if no award is

---

2. Appellee argues that since *Fox* was decided after the contingent-fee-agreement and the guaranty modifying that agreement were signed, *Fox* should not control the result here.  However, this court stated in *Fox* that "[e]ven prior to today's holding, Purdon had the absolute right to discharge Fox & Associates without proving just cause."  44 Ohio St.3d at 72, 541 N.E.2d at 450.  The *Fox* court also observed that "[t]he fact that the contract is contingent does not vest the attorney with an interest in the case or affect the right to discharge."  *Id.*  Hence, even prior to the *Fox* decision, appellant had a right to discharge appellee and an accompanying right to control his case file; and appellee had no vested right to recover on the contingency agreement.  Furthermore, we have concluded that the guaranty modifying that agreement is unenforceable and cannot have the effect appellee intended it to have.  Therefore, the *quantum meruit* recovery rule of *Fox* may properly be applied.

ever won. "[S]ince the attorney agreed initially to take his chances on recovering any fee whatever, we believe that the fact that the success of the litigation is no longer under his control is insufficient to justify imposing a new and more onerous burden on the client." *Id.* See, also, *Rosenberg*, *supra*, 409 So.2d at 1022 (deferring the discharged attorney's cause of action supports the goal of preserving client's freedom to discharge; any resulting harm to attorney is minimized because the attorney fee under original contingent agreement depended on contingency's occurrence). We believe that the considerations behind this rule are consistent with the policies espoused in *Fox*. Because the contingency occurred in this case (appellant ultimately recovered approximately $94,000), appellee may recover in *quantum meruit*, pursuant to *Fox*.

{¶ 20} As a further related matter, also consistent with the policies underlying the result in *Fox*, we find that the *quantum meruit* recovery of a discharged attorney should be limited to the amount provided for in the disavowed contingent fee agreement. In *Rosenberg*, *supra*, 409 So.2d at 1020, the court explained the reason behind adopting such a rule: "This limitation is believed necessary to provide client freedom to substitute attorneys without economic penalty. Without such a limitation, a client's right to discharge an attorney may be illusory and the client may in effect be penalized for exercising a right." See Brickman, setting the Fee When the Client Discharges a Contingent Fee Attorney (1992), 41 Emory L.J. 367, 369 (contending that the contingent fee amount should be the maximum recovery for a discharged attorney).

{¶ 21} A trial court called upon to determine the reasonable value of a discharged contingent-fee attorney's services in *quantum meruit* should consider the totality of the circumstances involved in the situation. The number of hours worked by the attorney before the discharge is only one factor to be considered. Additional relevant considerations include the recovery sought, the skill demanded, the results obtained, and the attorney-client relationship itself. See *Rosenberg*,

*supra*, 409 So.2d at 1022. Other factors to be considered will vary, depending on the facts of each case. As *Fox*, 44 Ohio St.3d at 71, 541 N.E.2d at 449-450, mentioned, the Code of Professional Responsibility, DR 2-106,[3] gives guidelines for determining the reasonableness of attorney fees. Because the factors to be considered are based on the equities of the situation, those factors, as well as the ultimate amount of *quantum meruit* recovery by a discharged attorney, are matters to be resolved by the trial court within the exercise of its discretion.

{¶ 22} In this case, it is not clear from the record, or from the trial court's order, whether the trial court considered all the facts and circumstances surrounding the matter in computing appellee's $2,500 recovery. In particular, the referee appears not to have complied with the trial court's directions to utilize *quantum meruit* in determining the amount of damages. Instead, the referee heard evidence

---

3. DR 2-106(B) provides, in pertinent part:
    "*** Factors to be considered as guides in determining the reasonableness of a fee include the following:
    "(1) The time and labor required, the novelty and difficulty of the questions involved,; and the skill requisite to perform the legal service properly.
    "(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
    "(3) The fee customarily charged in the locality for similar legal services.
    "(4) The amount involved and the results obtained.
    "(5) The time limitations imposed by the client or by the circumstances.
    "(6) The nature and length of the professional relationship with the client.
    "(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
    "(8) Whether the fee is fixed or contingent."
    We recognize that attorneys operating under contingent fee representation agreements sometimes do not maintain detailed records concerning hours worked and certain expenses incurred. By the very nature of the contingent agreement, the attorney receives a fixed amount following successful completion of the representation without regard to the number of hours worked. The lack of accurate recordkeeping sometimes makes it difficult to establish what a reasonable value of services rendered should be. However, despite this possible difficulty of proof, the principles set forth in *Fox* and in this case require the discharged attorney to establish the reasonable value of services rendered, and the number of hours worked is an important factor to be considered by a trial court in determining that value. An attorney operating under even a contingent-fee contract should keep an accurate record of time and resources expended. "Every attorney [including one operating under a contingent fee agreement] runs the risk of being discharged and needing proof of effort in order to recover any fee." Sloan, *supra*, 42 De Paul L.Rev. at 446.

which focused on whether the guaranty signed by appellant was enforceable, leading to the recommendation that *quantum meruit* was not the proper measure of recovery.

{¶ 23} It appears that the parties at trial presented very little evidence going to what a proper *quantum meruit* recovery should be, beyond the hours worked on the matter. Because the referee gave only limited consideration to a determination of appellee's *quantum meruit* damages, and because the trial court relied on evidence presented at trial to set the amount of the *quantum meruit* recovery, we are not convinced the trial court had sufficient information before it to conduct a thorough consideration of all relevant factors. We remand this cause to allow the trial court to specifically address the amount of appellee's recovery in *quantum meruit*, in light of the principles delineated in *Fox* and in this opinion.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., A.W. SWEENEY and WRIGHT, JJ., concur.

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur in part and dissent in part.

_____

**DOUGLAS, J., concurring in part and dissenting in part.**

{¶ 24} Our decision today may be the worst of the bad jokes about lawyers. Unfortunately, this is no joke. What we say today is that lawyers are the only persons in this state who are prohibited from enforcing written contracts according to their express terms and conditions when such contracts involve payment for services and a dispute, regardless of cause or merit, arises over representation. I would think that even those who are most critical of lawyers and the legal profession would find this policy to be patently unfair.

{¶ 25} Accordingly, I concur with the majority in paragraph one of the syllabus. If *quantum meruit* is to remain the test, I also concur with paragraph three of the syllabus. I respectfully dissent with regard to paragraph two of the syllabus

and, specifically, the continued application, in cases such as the one before us, of the rule of *quantum meruit*. I also dissent with regard to the ultimate judgment of the majority in reversing the judgment of the court of appeals. I would affirm the judgment of the court of appeals for the reason stated by that court and/or for the reasons stated *infra*.

{¶ 26} This case graphically presents a problem that is increasing in scope in our profession. It is a problem that is unpleasant to confront and dealing with the problem may appear, to some, to be lawyer self-serving in nature. It would be easier to quietly ignore the problem as though it did not exist and, thereby, keep our dirty linen within our own household. Unfortunately, such a course of action ignores reality and does nothing to help those who must confront circumstances such as are presented by today's case. The genesis of this case and others like it should be branded for what it is—"case stealing."

{¶ 27} Given *Fox & Associates Co., L.P.A. v. Purdon* (1989), 44 Ohio St.3d 69, 541 N.E.2d 448, the majority opinion very fairly sets forth the facts necessary for a determination in this matter. However, there is more to the story and this story should be told.

{¶ 28} There are three principal players in this case. Two are parties: the law firm of Reid, Johnson, Downes, Andrachik & Webster ("Reid") and Donald Lansberry ("Lansberry"). The third is attorney William A. LeFaiver ("LeFaiver"), a non-party.

{¶ 29} LeFaiver was admitted to practice law in Ohio in 1969. Between August 1969 and April 1979, LeFaiver was an attorney with the United States Department of Justice in Cleveland. From April 1979 to April 1983, he was in private practice with the law firm of Hahn, Loeser, Freedheim, Dean & Wellman. In May 1983, LeFaiver became associated with the law firm of Guren, Merritt, Fiebel, Sogg & Cohen. This association continued for one year (until May 1984). In June 1984, LeFaiver joined the Reid law firm and, as an employee of the firm,

was paid an annual salary of $60,000. This employment relationship continued until June 1986 when LeFaiver either withdrew from or was discharged by the firm.

{¶ 30} In October 1984, Lansberry was injured in a motor vehicle accident. Lansberry and his wife asked LeFaiver, who was then an associate of the Reid law firm, to represent them.[4] After consultation with others in the firm, LeFaiver had the Lansberrys sign an agreement denominated as a "Contingent Fee Contract." The contract was executed on December 10, 1984 and the parties were the Reid law firm and the Lansberrys. The law firm agreed to represent the Lansberrys and, for its services, the law firm was to receive 33.3 percent of the proceeds of any settlement before suit or 40 percent after suit. The contract is part of the record in this case and, without question, the *only* parties to the contract are the Reid law firm and the Lansberrys.

{¶ 31} After LeFaiver left the Reid law firm in 1986, a dispute between LeFaiver and the law firm erupted with the law firm contending that LeFaiver, in various ways, was undermining the law firm's relationship with various clients. The majority opinion details only some of the activity involving Reid, the Lansberrys and LeFaiver. This activity (as later found by the referee) included *LeFaiver* writing letters to the Reid law firm which were signed by Lansberry; LeFaiver entering into *another* contingent fee contract (on the *same* day as Lansberry's first letter to Reid) with the Lansberrys, with LeFaiver knowing full well of the existence of the contingent fee contract between the Lansberrys and Reid; and LeFaiver drafting, and having the Lansberrys execute on October 20, 1986, a guaranty of payment of the Reid contingent fee contract, which guaranty contract Mrs. Lansberry, at trial, testified she and her husband never planned to abide by even as they signed the agreement.

---

4. The Lansberrys knew, and had been represented by, LeFaiver before LeFaiver became associated with the Reid law firm.

{¶ 32} While the majority opinion tells us some of this story, what the majority does *not* tell us is that the Reid law firm, on October 23, 1986, filed a declaratory judgment, injunctive relief and money damages action against LeFaiver alleging, *inter alia*, that LeFaiver "[p]rior to June 1, 1986 and subsequent to June 1, 1986 * * * embarked on a course of conduct that was intended to interfere with, damage, and compromise plaintiff's [Reid's] professional relationship with various clients." Reid then prayed for an order "* * * enjoining and restraining defendant [LeFaiver] from interfering with the contractual relationships that exist between plaintiff firm and various clients"; an order "* * * enjoining defendant from issuing defamatory statements [against the Reid law firm]"; an order "* * * restraining and enjoining defendant from harassing, annoying, or interfering with the pending litigation or settlement negotiations that are ongoing between the firm and various firm clients and defense representatives"; an order for defendant to "* * * establish an escrow account and deposit any and all funds received from various firm clients * * *"; and an order for defendant to immediately account to the firm for any and all funds that defendant has received from various firm clients * * *" and for compensatory damages of $100,000 and punitive damages of $150,000.

{¶ 33} Since the full record of this underlying case is not before us, it cannot be determined what all went into the resolution of the Reid versus LeFaiver lawsuit. What we do know from the record before us is that the case was settled and at least part of the settlement included LeFaiver's writing letters to the Lansberrys, a Ms. Klein and a Mr. and Ms. Nannarone renouncing any right or claim in various settlement checks sent by insurance carriers to the letter recipients. LeFaiver's letter to the Lansberrys, dated September 28, 1987, was typical and stated, in part, that "[a]s to that settlement check sent to you in the amount of $21,666.67 and made payable by the involved insurance carrier to both you and the Reid, Johnson law firm * * *, please be advised that I make absolutely *no* claim to nor assert *any* right

or benefit in or to any such sum. * * *" (Emphasis in original.) It is difficult to ignore these letters and their import.

{¶ 34} Meantime, in either October or November 1987, Lansberry's suit for his personal injuries was settled for about $94,000. By order entered in *that* case, Judge Winter directed funds from an insurance company draft for $21,666.67 (presumably pursuant to the Reid-Lansberry contingent fee contract) be placed in escrow "* * * until the fee dispute among Plaintiffs [Lansberrys] and their former [Reid] and present [LeFaiver] attorneys is resolved." Subsequently, on December 8, 1989, Reid, in the case now before us, sued Lansberry in an effort to enforce the contingent fee contract.

{¶ 35} This case was assigned to Judge Morgan. Judge Morgan had the right idea of how to settle the matter in this and like cases. At a March 13, 1990 pretrial, Judge Morgan indicated that Reid should file an amended complaint and bring LeFaiver into the case as a necessary party. Reid declined to do this on the basis that LeFaiver had, by this time, waived any claim to the escrowed funds. Judge Morgan's suggestion was right on point, especially given that LeFaiver filed an affidavit in the case saying that the Lansberrys owed LeFaiver "* * * more than $33,000.00 which is yet to be paid * * *."[5]

{¶ 36} Judge Morgan referred the case for trial before Referee Shoemaker. Upon conclusion of the trial, the referee filed a report with the trial court which is both extensive and illuminating. For a complete understanding of this case, the referee's report should be read in full. Several of the referee's "conclusions of law" should be noted here.

---

5. On this subject, LeFaiver testified as follows:

"Q. Did you warn them [the Lansberrys]—it's a simple question. Did you warn them, 'You may have to pay two fees'? That can be answered yes or no.

"A. I told—I told them that it was likely they would have to pay the law firm of Reid, Johnson what the law firm earned as well as my fee, *which I had a contractual agreement with them regarding.*" (Emphasis added.)

**{¶ 37}** The referee reported to the judge that "[t]hroughout all this, they [the Lansberrys] had legal advice from Attorney LeFaiver, who not only drafted the original letters in August and September, but also the guarant[y] which was to secure the payment of the $21,666.67. It is also concluded that neither Mr. Lansberry nor Mrs. Lansberry ever intended to live up to the agreement, even when they signed it and gave it to their attorney to be returned to the Plaintiff. * * * There is also *no evidence* that the execution of such document was the only way that the Defendant and his wife could get their file so they might be able to file a suit to protect the running of the two year statute of limitations in the matter. Likewise, the record is *barren of proof* that the Plaintiff's conduct in retaining the Defendant's file was in violation of some professional code requirement and/or let alone in violation of any law in Ohio. While that point is suggested by Attorney LeFaiver [who had, without apparent cause, sent information concerning Reid to Disciplinary Counsel—another problem we may have to deal with some day], there is *no* indication that any board or agency adjudicated the conduct of the Plaintiff in such matter. Considering the background, education and the totality of the circumstances surrounding this matter, the Defendant and his wife are found not to have signed the document of October 20, 1986 [the guaranty agreement] because of any duress or coercion. Rather, the Referee concludes the signing of the document and its presentation through Attorney LeFaiver to the Plaintiff was done *to trick* the Plaintiff into releasing the file, based upon the promise of the Defendant and his wife to pay the $21,666.67 set forth therein." (Emphasis added.) Now we know "the rest of the story."

**{¶ 38}** The referee went on to say that "[t]he evidence *overwhelmingly and well beyond the preponderance standard*, established that the Defendant held out to the Plaintiff that he and his wife wished to modify the original contingent fee agreement by means of the negotiated October 20, 1986 document * * *." (Emphasis added.) Finally, the referee said, "[w]herefore, the Plaintiff has

16

established by a preponderance of the evidence that it is entitled to the $21,666.67 amount * * *."

{¶ 39} In his judgment entry, Judge Morgan first noted that *no* objections, pursuant to Civ.R. 53(E)(2), to the referee's report had been filed. The judge then adopted the referee's report, conclusions, findings and recommendations as his own—except the portion of the report dealing "with the applicable rule of law." Judge Morgan then noted that prior to this court's ruling in *Fox*, *supra*, "* * * Ohio recognized that an attorney could recover upon a contingent fee contract with a client if he had been discharged without cause. If he had been discharged with cause, the most he could recover would be a *quantum meruit* amount. However, *Fox*, *supra*, substantially changed the previous line of Ohio cases regarding an attorney's recovery on a contingent fee contract * * *." Being bound to follow *Fox*, Judge Morgan then held that Reid was only entitled to recover "its quantum meruit services in the amount of $2,500."

{¶ 40} Thus, Reid had *two* written unambiguous contracts with the Lansberrys and could collect on neither. Reid appealed. The court of appeals found, it thought, a way around the dilemma. The appellate court found that *Fox* did not apply because the Lansberrys "* * * entered into a new guaranty contract, upon the advise [*sic*] of attorney [LeFaiver] * * *" after having discharged the law firm in September of 1986. Thus, concluded the court of appeals, "[t]he law firm is therefore entitled to a fee based on the terms of the guaranty."

{¶ 41} Now the case is before us to take another look at whether we did the right thing in *Fox*. I concurred in *Fox* and still agree that a client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject, however, to the obligation of the client to compensate the attorney or firm. I no longer agree, given this case and numerous other like situations that are well-known in the profession, that *quantum meruit* should be the basis of fee recovery. To

continue this test deprives lawyers of the basic rights of contract law that all other citizens are afforded. I now believe I was in error in concurring in *Fox*.

{¶ 42} It is a fundamental principle that parties are generally free to negotiate the terms of a contract. In *Blount v. Smith* (1967), 12 Ohio St.2d 41, 47, 41 O.O.2d 250, 253, 231 N.E.2d 301, 305, this court said that "[t]he right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to write and to speak *without restraint. Responsibility for the exercise, however improvident, of that right is one of the roots of its preservation*." (Emphasis added.)

{¶ 43} Not so long ago the General Assembly decided that the tort system needed to be looked at—and maybe overhauled better describes its action. In R.C. 4705.15(B), the General Assembly said that "[i]f an attorney and a client contract for the provision of legal services in connection with a claim that is or may become the basis of a tort action and if the contract includes a contingent fee agreement, that agreement shall be reduced to writing and signed by the attorney and the client. The attorney shall provide a copy of the signed writing to the client."

{¶ 44} Given our decision in *Fox* and our holding today, one might logically ask, "What happened to what the Ohio Supreme Court said in *Blount* and what purpose does R.C. 4705.15 serve when the contract can be breached at will by a client?" The only logical answer is that the law of contract protects all but lawyers whose services involving a contingent fee contract are terminated, even without cause, by a client.

{¶ 45} It should be recognized that in today's competitive market place, substantial expense has been incurred by a law firm (lawyer) before a client even comes in the door. Much of this expense, such as that related to a firm's reputation, contacts, consultation and services not covered by a fee, office space with attendant overhead and even advertising of the law firm (lawyer) through public appearances and other forms, inures to the benefit of a client. When a case is pirated by a firm

member or associate or even by another attorney not ever connected with the firm who will, maybe just before settlement, "do it for less"—and the rule for the original attorney for compensation is *quantum meruit*, we just encourage such activity.

{¶ 46} This need not be so!  In *Cleveland Co. v. Standard Amusement Co.* (1921), 103 Ohio St. 382, 387, 133 N.E. 615, 616, this court set forth "* * * that where one party repudiates a continuing contract the injured party may (1) treat the contract as rescinded and recover on a *quantum meruit* so far as he has performed, or (2) keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform at the end of the time specified in the contract, and sue and recover under the contract, or (3) he may treat the repudiation as putting an end to the contract for all purposes of performance and sue to recover as far as he has performed and for the profits he would have realized if he had not been prevented from performing."  See, also, *Wellston Coal Co. v. Franklin Paper Co.* (1897), 57 Ohio St. 182, 48 N.E. 888; 3 Restatement of the Law 2d, Contracts (1981), Sections 344-347, 378; 2 Restatement of the Law 2d, Agency (1958), Sections 453, 455; and 11 Williston, Law on Contracts (3 Ed. 1968), Section 1358; 12 Williston (1970), *supra*, at Section 1459.  Until Fox and the decision today which further perpetuates *Fox*, this court has long adhered to the general rule of contract law set forth above, allowing an attorney or law firm discharged by a client prior to completion of the contract to recover the bargained-for contract price.  See *Scheinesohn v. Lemonek* (1911), 84 Ohio St. 424, 95 N.E. 913; *Roberts v. Montgomery* (1926), 115 Ohio St. 502, 154 N.E. 740; and *Bolton v. Marshall* (1950), 153 Ohio St. 250, 41 O.O. 270, 91 N.E.2d 508.  *Fox* changed all this law by overruling these cases.

{¶ 47} If we make it clear that contingent fee contracts will be enforced and that any lawyer taking a case being handled by another firm or lawyer takes the case encumbered with the fee agreement with the original firm subject, of course, to a judicial determination as to how the fee should be divided between the lawyers,

then we serve the purpose and theory of the law and protect clients. Clients should not be required to be involved in lawyer fee disputes. If an action is filed to recover under a contingent fee agreement, then the subsequent lawyer (as Judge Morgan suggested) can be joined and we could require that the client be responsible only for that which the client has contracted for and the dispute (and the expense of the dispute) should be only between the lawyers.

{¶ 48} In the case before us, to date Lansberry has paid *nothing* even though he has received a settlement of over $90,000. He now wants to pay Reid only $2,500. Viewing what has gone on in this case to this point, it is difficult to determine the outcome of LeFaiver's and the Lansberrys' contingent fee agreement. Maybe Lansberry, now that he has won in this case, will tell LeFaiver that he (Lansberry) has a good thing going, discharge LeFaiver before payment is made and then tell LeFaiver to sue because the amount due will only be *quantum meruit*.

{¶ 49} To reach a just decision in this case, I would affirm the judgment of the court of appeals. I would go further, however, and have the syllabus paragraphs read:

"1. A client has an absolute right to discharge an attorney or law firm at any time, with or without cause, subject to the obligation to compensate the discharged attorney or firm.

"2. If the discharge is without cause and the client has entered into a contingent fee contract, the fee for services rendered shall be based upon the terms of the fee contract. (*Fox & Associates Co., L.P.A. v. Purdon* [1989], 44 Ohio St.3d 69, 541 N.E.2d 448, overruled.)

"3. If a dispute arises between attorneys over distribution of the amount of fees realized from a contingent fee contract, such dispute shall be settled between the attorneys without expense to any client."[6]

---

6. Contingent fee contracts remain under attack and scrutiny. See Passell, Contingency Fees in Injury Cases Under Attack by Legal Scholars, N. Y. Times, National Edition, Feb. 11, 1994, at A1,

{¶ 50} Because the majority opinion does not reach this result, I must respectfully dissent in part.

F.E. Sweeney and Pfeifer, JJ., concur in the foregoing opinion.

––––––––––––––––––––

col. 1.  This dissent is not meant to lend support or nonsupport for such fee agreements as we know them today.  My whole and only theme is that if a contract (any contract) is definite in nature and is entered into between two or more competent parties and is based upon a legal consideration to do or refrain from doing some lawful thing, then it should be enforced.