137 F.3d 885
 42 Cont.Cas.Fed. (CCH) P 77,259, 35 UCC
Rep.Serv.2d 652
Robert P. CAMPANELLA, Robert P. Campanella & Associates,
Plaintiffs-Appellants,
v.
COMMERCE EXCHANGE BANK, United States Small Business
Administration, Defendants-Appellees,
McKean Machinery Sales, Inc., Defendant.
 No. 96-4074.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 27, 1997.
Decided Feb. 25, 1998.
 
 Timothy N. Toma (argued and briefed), Timothy N. Toma Company, Euclid, OH, for Plaintiffs-Appellants.
 Kirk W. Roessler (argued and briefed), William R. Strachan (briefed), Strachan, Green, Miller & Olender, Cleveland, OH, for Defendant-Appellee Commerce Exchange Bank.
 Arthur I. Harris, Asst. U.S. Attorney (argued and briefed), Paul Kukuca (briefed), Office of the U.S. Attorney, Cleveland, OH, for Defendant-Appellee U.S. Small Business Administration.
 Before: RYAN, BATCHELDER, and CLAY, Circuit Judges.
 OPINION
 RYAN, Circuit Judge.
 
 
 1
 The plaintiffs, Robert P. Campanella and Robert P. Campanella & Associates, filed this suit against the Commerce Exchange Bank and the United States Small Business Administration (SBA), advancing six theories of recovery. The district court, in a magistrate-judge adjudication pursuant to 28 U.S.C. § 636(c), dismissed two contract claims for lack of subject-matter jurisdiction and granted summary judgment on the merits with respect to the remaining four claims. The plaintiffs filed this appeal, arguing that the district court erred in concluding (1) that the Contract Disputes Act of 1978, 41 U.S.C. § 601-613, divested it of subject-matter jurisdiction over the plaintiffs' contract claims; (2) that the defendants had no obligation to pay storage and brokerage expenses; and (3) that the defendants had no duty to Campanella to dispose of the property in a commercially reasonable manner and turn over the proceeds to Campanella as payment for administrative expenses.
 
 
 2
 We will affirm in part, but reverse in part and remand to allow the district court to decide whether it wishes to exercise supplemental jurisdiction over the contract claims brought against Commerce Exchange, the non-governmental defendant.
 
 I.
 
 3
 In June 1991, a manufacturer of carbide tooling known as U.S. Carbide Company, of which defendant Robert Campanella was owner and president, sold its assets to U.S. Carbide Manufacturing Company, which was owned and operated by Steven Dawson, not a party to this suit. As part of the purchase agreement, Carbide-Dawson gave Carbide-Campanella a promissory note in the amount of $80,000, for which the assets of Carbide-Dawson served as security. Defendant Commerce Exchange Bank, however, had provided a $230,000 loan to Carbide-Dawson, for which it received a superior security interest in the same assets. Defendant SBA guaranteed 85% of the loan from Commerce Exchange to Carbide-Dawson.
 
 
 4
 At the same time as it acquired Carbide-Campanella's assets, Carbide-Dawson entered into a lease in which it rented from Campanella & Associates the premises in Independence, Ohio where the Carbide business was located. In July 1993, the lease was amended to operate on a month-to-month basis, for a rent of $4000 per month.
 
 
 5
 Carbide-Dawson failed to pay the Commerce Exchange/SBA loan amount when it was due, causing Commerce Exchange to accelerate the note and then, in mid-September 1993, to institute an action in state court to enforce payment. On October 11, 1993, Dawson informed the SBA, Commerce Exchange, and Campanella that Carbide-Dawson was moving the business and virtually all of the assets to another location. The lease with Campanella & Associates was formally terminated effective October 15, 1993.
 
 
 6
 Five days later, Dawson and Campanella met at the premises for a walk-through, and Campanella discovered that the premises were dirty and in disrepair. In addition, Campanella learned that Dawson planned to leave behind some 17 pieces of equipment as well as some raw material. Dawson gave Campanella the keys to the premises.
 
 
 7
 Campanella then contacted C. Robert Green, who was the Special Assets Manager for Commerce Exchange and was responsible for administering the loan to Carbide-Dawson. Campanella told Green of Carbide-Dawson's exodus and of the presence of the equipment, and further told Green that he intended to sell the equipment and use the proceeds to offset money that Carbide-Dawson owed. Green objected to this on the ground that Commerce Exchange had a superior lien on the assets, and told Campanella "to make no attempt to dispose of the equipment."
 
 
 8
 Campanella then met at the premises, on October 28, with Green and with Deborah Callen, a loan officer for the SBA, in order to inspect the equipment left by Dawson. When the three left the premises, Campanella retained the keys. There is no question that neither Commerce Exchange nor the SBA had any access to the premises except with Campanella's cooperation.
 
 
 9
 Carbide-Dawson filed for Chapter 11 bankruptcy on November 3, 1993, and represented in its petition that the equipment belonged to the SBA. Commerce Exchange moved for relief from the automatic stay on November 23, 1993, requesting permission to take possession of and sell the equipment. At around this period, Carbide-Dawson and Commerce Exchange entered into an agreement in which Carbide-Dawson agreed to pay $3000 per month as "adequate protection payments," and further agreed that Carbide-Dawson would not object to any disposal of the equipment.
 
 
 10
 Callen had the abandoned equipment appraised, and was told that the liquidation value was $5800. She then contacted some prospective buyers, whose names had been provided by Campanella, and in December 1993, Campanella, Callen, and prospective buyers met at the premises in order to inspect the equipment.
 
 
 11
 On February 16, 1994, Callen wrote a letter to Dawson, notifying him that a sale of the collateral had been negotiated for the price of $5,655. On February 22, 1994, the bankruptcy court approved the above-mentioned agreement between Commerce Exchange and Dawson--relating to the protection payments and Dawson's non-objection to disposal of the equipment--and the defendants then had the equipment removed from the premises.
 
 
 12
 In late March 1994, Campanella then wrote a letter to Green and Callen, claiming that he was due $4000 per month rent between October and March, and for brokerage services, due $75 per hour for 28 hours, for a total of $26,100. Writing for the SBA, Callen responded that Campanella was entitled to no storage fees. With regard to the brokerage fees, Callen wrote:
 
 
 13
 With respect to compensation you claim to have earned, as you know, neither SBA nor Commerce Exchange Bank has formally agreed to pay you any compensation whatsoever. However we did indicate, in general terms, that we believed some agreement could be reached.
 
 
 14
 Callen then alluded to some "negative" actions that Campanella took that "resulted in a smaller recovery than what we otherwise could have expected," which actions are not specified in the record; in any event, Callen offered Campanella compensation of 15% of the approximately $6000 sale, or roughly $900.
 
 
 15
 Campanella was not satisfied, and in July 1994, he brought suit in federal district court against Commerce Exchange, the SBA, and a third party, McKean Machinery Sales, which party was later dismissed. Campanella asserted six claims for relief: two straight contract claims; one quantum meruit claim; and three tort claims.
 
 
 16
 The SBA filed a motion to dismiss in November 1995, arguing that exclusive jurisdiction over the plaintiffs' contract claims was in the Claims Court, and that the tort claims failed because no administrative claim was ever filed before bringing suit, as is required by the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. The SBA also joined with Commerce Exchange in a motion for summary judgment on the merits of the plaintiffs' claims.
 
 
 17
 In April 1996, however, the district court filed a memorandum opinion regarding the jurisdictional arguments, raising the applicability of the Contract Disputes Act of 1978, 41 U.S.C. § 601-613, and requesting supplemental briefing from the parties on that point. In July 1996, the district court then filed an opinion concluding that "the CDA preempts the exercise of jurisdiction over the first two claims for breach of contract found in the amended complaint, so that those claims are subject to dismissal." It is noteworthy, indeed, important to our ultimate disposition of this appeal, that the district court did not specifically address the plaintiffs' remedy with respect to Commerce Exchange, a non-governmental defendant to whom the CDA is not applicable. Apparently, the court instead simply assumed that if the breach of contract claims could not proceed against the SBA, they likewise could not proceed against Commerce Exchange. With respect to the third, unjust enrichment claim, the court concluded that "the CDA could not apply to claims which are quasi-contractual in nature, such as claims for unjust enrichment." The court declined, however, to dismiss the plaintiffs' tort claims, holding that the plaintiffs satisfied the requirements of the FTCA by providing sufficient written notice of their claims, so as to make the SBA "aware[ ] ... of the potential for tort liability."
 
 
 18
 Shortly thereafter, the district court issued its decision with respect to the defendants' motion for summary judgment. It concluded that Campanella's quantum meruit claim failed because Campanella did not confer a substantial benefit on the defendants since the defendants did not actually possess the equipment and thus had no duty to pay storage fees. Next, it addressed Campanella's claim that the defendants were obligated to apply the proceeds from the equipment sale first to the "administrative expenses" of the storage fees, and concluded that although Ohio law "imposes an obligation upon a secured party to apply proceeds from the sale of collateral to certain reasonable expenses involved in disposing of the collateral there is nothing in that provision which creates a fiduciary relationship between a secured party and another person having possession of the collateral." Next, it addressed Campanella's complaint that the defendants failed to dispose of the equipment in a commercially reasonable manner, and concluded again that Campanella was simply not entitled to fees for storage and services. Finally, it rejected a trespass claim brought by Campanella on the ground that "[n]owhere in this record is there any indication that Mr. Campanella advised the defendants that the equipment could not remain on his property." We note that Campanella has not, however, pursued his trespass claim before this court, and we therefore treat it as abandoned. See Costantino v. TRW, Inc., 13 F.3d 969, 971 n. 1 (6th Cir.1994).
 
 
 19
 Campanella filed a timely appeal.
 
 II.
 A.
 1.
 
 20
 "Because the SBA is an agency of the United States, it enjoys sovereign immunity except to the extent waived, 'and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' " A & S Council Oil Co. v. Lader, 56 F.3d 234, 238 (D.C.Cir.1995) (citation omitted), cited with approval in RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1137 (6th Cir.1996). In their complaint, the plaintiffs premised subject-matter jurisdiction and waiver of sovereign immunity for their contract claims on the SBA's "sue and be sued" clause, which provides that the SBA "may--(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy." 15 U.S.C. § 634(b)(1).
 
 
 21
 The district court, however, concluded that the CDA preempts the general sue-and-be-sued clause. The CDA "applies to any express or implied contract ... entered into by an executive agency for--(1) the procurement of property, other than real property in being ... or[ ] (4) the disposal of personal property," 41 U.S.C. § 602(a), and prescribes that "[a]ll claims by a contractor against the government relating to a contract ... shall be submitted to the contracting officer for a decision," id. § 605(a). The exclusive fora for appeal from an adverse decision by the contracting officer are the agency's board of appeals and the Claims Court--not the federal district court. See id. §§ 606, 609; 28 U.S.C. § 1346(a)(2). See generally RMI Titanium, 78 F.3d at 1135. The "twin aims" of the CDA "are the facilitation of both contract dispute resolution and the formation of government contracts," RMI Titanium, 78 F.3d at 1139 (citation omitted), by centralizing the process of contract-dispute resolution and thus making it more efficient. In short, "[t]he CDA is intended to keep government contract disputes out of district courts; it limits review of the merits of government contract disputes to certain forums, both to limit the waiver of sovereign immunity and to submit government contract issues to forums that have specialized knowledge and experience." United States v. Kasler Elec. Co., 123 F.3d 341, 346 (6th Cir.1997).
 
 
 22
 We note that it is beyond question that federal courts have a continuing obligation to inquire into the basis of subject-matter jurisdiction to satisfy themselves that jurisdiction to entertain an action exists. See Nationwide Mut. Ins. Co. v. Cisneros, 52 F.3d 1351, 1361 (6th Cir.1995), cert. denied, 516 U.S. 1140, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996); United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1325 (6th Cir.1993). This duty applies irrespective of the parties' failure to raise a jurisdictional challenge on their own, and if jurisdiction is lacking, dismissal is mandatory. Fed.R.Civ.P. 12(h)(3). In asserting that the district court erred in its jurisdictional assessment, Campanella essentially argues that the sue-and-be-sued provision in the SBA statute confers jurisdiction in the district court, irrespective of the terms of the CDA. We will review de novo the district court's determination that it lacked subject-matter jurisdiction. See Friends of Crystal River v. United States Envtl. Protection Agency, 35 F.3d 1073, 1077 (6th Cir.1994).
 
 
 23
 Two cases have considered whether the SBA's sue-and-be-sued clause exempts plaintiffs from the necessity of complying with the administrative procedures of the CDA. The one relied on by the district court and the appellees here, A & S Council, is a decision by the D.C. Circuit holding that the CDA trumps the SBA's sue-and-be-sued clause. The other is a decision by the Ninth Circuit, In re Liberty Construction, 9 F.3d 800 (9th Cir.1993), reaching the opposite conclusion.
 
 
 24
 In A & S Council, the court reasoned that the CDA grants exclusive jurisdiction to the Claims Court for any contract actions over $10,000 "except to the extent that Congress has 'granted any other court authority to hear the claims that may be decided by the Claims Court.' " A & S Council, 56 F.3d at 241 (citation omitted). In A & S Council, as here, "the only plausible source of such alternative authority is the SBA's 'sue and be sued' clause." Id. The court concluded that the CDA nullified this grant of authority:
 
 
 25
 The Contract Disputes Act, however, appears to be the paradigm of a "precisely drawn, detailed statute" that preempts more general jurisdictional provisions. Brown v. GSA, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968-69, 48 L.Ed.2d 402 ... (1976). It purports to provide final and exclusive resolution of all disputes arising from government contracts covered by the statute....
 
 
 26
 By its express terms, the CDA applies to "executive agenc[ies]", 41 U.S.C. § 602(a), which § 601(2) defines as encompassing not only "executive department[s]" but also (1) "independent establishment[s]" as defined in 5 U.S.C. § 104, namely "an establishment in the executive branch [with certain irrelevant exceptions] which is not an Executive department, military department [or] Government corporation", plus (2) a variety of other entities including many of the entities excluded from the definition in 5 U.S.C. § 104, such as Government corporations, the U.S. Postal Service and the Postal Rate Commission. Despite these sweeping terms, it might still be the case that the SBA's sue-and-be-sued clause permitted review of contract disputes outside the CDA framework. Congress's explicit exceptions from the CDA, however, render any such inference highly improbable. Although a sue-and-be-sued clause governs the Tennessee Valley Authority, see 16 U.S.C. § 831c(b) (1988), Congress expressly exempted a limited class of TVA contracts from the CDA, see 41 U.S.C. § 602(b). The exemption would have been wholly unnecessary unless Congress assumed that a sue-and-be-sued clause would not trump the CDA's exclusivity provisions.
 
 
 27
 Id. at 241-42. Thus, the court concluded, the contract claims at issue in its case fell under the exclusive terms of the CDA.
 
 
 28
 In Liberty, the Ninth Circuit's holding to the contrary is devoid of analysis. The court simply held the CDA did not operate to divest district courts of jurisdiction of any contract claim against the government, "regardless of the amount sought, so long as there exists a basis for jurisdiction independent of the Tucker Act." Liberty, 9 F.3d at 802 (emphasis added). The SBA, it concluded--without explanation--was an adequate independent basis for jurisdiction.
 
 
 29
 We conclude that the district court was correct in holding that it lacked subject-matter jurisdiction over the contract claims against the SBA. We find the reasoning of A & S Council to be sound, and we agree with it. Assuming, without deciding, that the sue-and-be-sued clause is a jurisdictional grant and not simply a waiver of sovereign immunity, but see Kroll v. United States, 58 F.3d 1087, 1092 n. 7 (6th Cir.1995), it is clear to us that the CDA operates to withdraw the grant.
 
 2.
 
 30
 We must next decide which of the plaintiffs' claims constitute "contract" claims within the meaning of the CDA. This question presents no serious hurdle with respect to the two straightforward contracts counts of the complaint; the plaintiffs do not suggest otherwise. There is an issue, however, whether the quantum meruit claim should be considered a contract claim. As this court explained in RMI Titanium,
 
 
 31
 for the CDA to apply, it must first be determined that the claims asserted are "essentially contractual" in nature. The plaintiff's title or characterization of its claims is not controlling.... Rather, it is the determination of whether the action is essentially a contract dispute that controls.
 
 
 32
 RMI Titanium, 78 F.3d at 1136 (citation omitted).
 
 
 33
 "The equitable doctrine of quantum meruit is based on an implied 'promise on the part of the defendant to pay the plaintiff as much as he reasonably deserved to have for his labor.' " Reid, Johnson, Downes, Andrachik & Webster v. Lansberry, 68 Ohio St.3d 570, 629 N.E.2d 431, 434 n. 1 (1994) (citation omitted). In Ohio,
 
 
 34
 [t]he essential elements of recovery under quantum meruit are:
 
 
 35
 "(1) Valuable services were rendered or materials furnished, (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services was expecting to be paid by the person sought to be charged."
 
 
 36
 Sonkin & Melena Co., L.P.A. v. Zaransky, 83 Ohio App.3d 169, 614 N.E.2d 807, 811-12 (1992) (citation omitted).
 
 
 37
 We think it is quite clear that the quantum meruit claim is reasonably understood to be essentially a contract claim. Cf. A & S Council, 56 F.3d at 240. The allegations in this count are virtually identical to those in the straight contractual counts, and it makes no sense that the latter would be barred by the CDA but the former could proceed.
 
 3.
 
 38
 Section 1367 of Title 28 provides that "the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (emphasis added). In other words, if there is some basis for original jurisdiction, the default assumption is that the court will exercise supplemental jurisdiction over all related claims. A district court may, however, "decline to exercise supplemental jurisdiction over a claim" for any one of four reasons:
 
 
 39
 [I]f--
 
 
 40
 (1) the claim raises a novel or complex issue of State law,
 
 
 41
 (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
 
 
 42
 (3) the district court has dismissed all claims over which it has original jurisdiction, or
 
 
 43
 (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.
 
 
 44
 28 U.S.C. § 1367(c). We review for an abuse of discretion the district court's decision to exercise, or not to exercise, supplemental jurisdiction. Landefeld v. Marion Gen. Hosp., Inc., 994 F.2d 1178, 1182 (6th Cir.1993); cf. Zuniga v. Blue Cross & Blue Shield of Michigan, 52 F.3d 1395, 1400 (6th Cir.1995).
 
 
 45
 The district court here made no decision with respect to supplemental jurisdiction. Instead, it apparently assumed that the lack of subject-matter jurisdiction with respect to the contract claims against the SBA necessitated dismissal of the contract claims against Commerce Exchange. While the district court was free to decline to exercise its supplemental jurisdiction over those latter claims, it is nonetheless clear that such supplemental jurisdiction did exist, as the claims were closely intertwined with the non-contract claims that continued to remain after the dismissal. The district court appears not to have recognized that it had supplemental jurisdiction, and thus failed to actually undertake an exercise of discretion when it dismissed those claims. In any event, it gave no explanation of why the claims should have been dismissed. And even though, as we shall explain below, it was correct in later granting summary judgment on the non-contract claims, it could nonetheless have continued to exercise supplemental jurisdiction over the contract claims against Commerce Exchange. Cf. 28 U.S.C. § 1367(c)(3). We will, therefore, remand the proceedings to the district court to allow it properly to address the question of whether it wishes to entertain these claims.
 
 B.
 
 46
 Campanella next argues that he was entitled to recover for the value of the space where the machines were stored, and that the magistrate judge erroneously concluded that the storage provided no benefit to the defendants by concluding that the defendants had not repossessed the collateral. Apparently arguing both that the issue of repossession was a genuine issue of material fact and that it should have been decided in his favor as a matter of law, he contends that the SBA and Commerce Exchange had the power to exercise dominion or control over the collateral, which equates with their having constructive possession.
 
 
 47
 As a preliminary matter, we observe that this quantum meruit claim cannot proceed against the SBA because, as we have already noted, it is barred by the CDA. It may, however, proceed against Commerce Exchange, and we shall therefore review de novo the district court's grant of summary judgment. See Kasler, 123 F.3d at 343.
 
 
 48
 As we stated earlier, Ohio courts have set forth four elements for a quantum meruit claim:
 
 
 49
 "(1) Valuable services were rendered or materials furnished, (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services was expecting to be paid by the person sought to be charged."
 
 
 50
 Sonkin & Melena Co., 614 N.E.2d at 811-12 (citation omitted).
 
 
 51
 Ohio's version of the Uniform Commercial Code imposes certain obligations on a secured party "in possession" of collateral, specifically: "A secured party must use reasonable care in the custody and preservation of collateral in his possession." OHIO REV.CODE ANN. § 1309.18(A). The parties appear to agree that the quantum meruit issue turns on whether the defendants were "in possession" of the collateral prior to its removal from the premises. That is, the only basis for imposing a duty of care for the collateral is found in section 1309.18; therefore, in the absence of their possession of the collateral, the defendants had no duty of care and thus would have received no identifiable benefit or value, within the meaning of a quantum meruit claim, from Campanella's storage.
 
 
 52
 While the plaintiffs are correct that there are cases from other jurisdictions that would treat the situation here as giving rise to "possession" by the secured creditors, two cases foreclose this theory in Ohio. In One Greenstreet, Inc. v. First National Bank, 19 Ohio App.3d 161, 482 N.E.2d 1255 (1984), the court plainly held that section 1309.18 only applies when a secured creditor has actual possession of the collateral. A mere right to acquire possession, or constructive possession, simply does not give rise to a duty of care or to a duty to pay expenses related to the storage of collateral. Id. 482 N.E.2d at 1259; accord Scott v. Ameritrust Co. Nat'l Ass'n, Nos. 50667, 50668, 1986 WL 6124 (Ohio Ct.App.1986).
 
 
 53
 To recapitulate, the quantum meruit claim against Commerce Exchange should have survived summary judgment only (1) if there is a genuine issue of material fact as to whether the defendants actually possessed the collateral, or (2) if, as a matter of law, constructive possession is sufficient and if, likewise, there is a genuine issue of material fact regarding constructive possession. Addressing the latter first, it is quite clear under Ohio law that actual possession is required to give rise to a duty of care on the part of the secured creditor. And it is likewise quite clear that there is no genuine issue of material fact as to whether the defendants actually possessed the collateral prior to its removal for sale. First, prior to the bankruptcy court's relief from the automatic stay on February 22, 1994, the defendants simply could not have possessed the collateral; it was, instead, possessed by the bankruptcy estate. See Easley v. Pettibone Michigan Corp., 990 F.2d 905, 909 (6th Cir.1993). And between that time and the collateral's actual removal from the premises, there is nothing to suggest that the defendants exercised any control whatsoever over the collateral. Thus, the quantum meruit claim against Commerce Exchange fails.
 
 C.
 
 54
 Campanella's final argument is that under Ohio law, the defendants had a duty to turn over the proceeds from the disposition of the equipment in order to cover administrative expenses, and that the district court erred when it concluded that no such duty existed.
 
 
 55
 This argument is premised entirely on the following section of Ohio's version of the U.C.C.:
 
 
 56
 (A) A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing.... The proceeds of disposition shall be applied in the order following to:
 
 
 57
 (1) The reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing, and the like[.]
 
 
 58
 OHIO REV.CODE ANN. § 1309.47(A)(1).
 
 
 59
 The plaintiffs' claim has no merit. Section 1309.47(A)(1) does not create a right of recovery for people in Campanella's position; all it says is that expenses, such as they are, come off the top of the disposition proceeds. The plaintiffs must have some independent basis for asserting that the expenses actually exist; because the defendants had no duty to the plaintiffs, in other words, there simply are no administrative expenses to which section 1309.47(A)(1) speaks. Therefore, the defendants did nothing wrong when they did not first distribute the administrative expenses from the proceeds. And given this fact, there is no need for the court to consider whether the sale was commercially reasonable.
 
 III.
 
 60
 We AFFIRM the district court's judgment insofar as it disposed of all claims against the SBA. We likewise AFFIRM the district court's judgment with respect to the grant of summary judgment to Commerce Exchange on the quantum meruit claim and three tort claims. We REVERSE the district court's judgment insofar as it dismissed the two contract claims brought against Commerce Exchange, and REMAND for a determination whether the district court wishes to exercise its supplemental jurisdiction over those claims.