CINCINNATI BAR ASSOCIATION *v.* WITT.

[Cite as *Cincinnati Bar Assn. v. Witt,*
103 Ohio St.3d 434, 2004-Ohio-5463.]

(No. 2004–0069—Submitted May 11, 2004—Decided October 27, 2004.)

———————

**Per Curiam.**

{¶ 1} Respondent, Jeffrey A. Witt of Cincinnati, Ohio, Attorney Registration No. 0066274, was admitted to the practice of law in Ohio in 1996. On February 10, 2003, relator, Cincinnati Bar Association, charged respondent with professional misconduct, mainly violations of DR 9–102(A) (requiring attorneys to deposit unearned fees in a separate, identifiable bank account) and 9–102(B)(3) (requiring an attorney to properly account for client's funds in attorney's possession). A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on the parties' comprehensive stipulations and exhibits and respondent's testimony, made findings of fact, conclusions of law, and a recommendation.

Misconduct

{¶ 2} Respondent is a sole practitioner who has worked almost entirely in criminal defense. In March 2001, Karen Sykes asked respondent to see that Maple Knoll Village, a retirement and nursing home where her mother, Barbara, was a resident, transferred Barbara from its nursing home to its assisted-living unit. Respondent decided to accept Barbara as a client.

{¶ 3} Respondent always charged his criminal-defense clients a flat fee. But in this civil matter, respondent, Karen, and Barbara orally agreed to an hourly fee of $250, and respondent was ultimately paid $10,000. Respondent deposited these funds as follows:

{¶ 4} 1. On March 6, 2001, Karen paid respondent $2,000 on her mother's behalf, and he deposited this sum in his trust account.

{¶ 5} 2. On March 21, 2001, after respondent had performed 11 hours of work, entitling him to $2,750 in fees, Karen paid him $3,000. Respondent

deposited this amount in his business operating account, thereby failing to deposit the unearned $2,250 in the trust account.

{¶ 6} 3. On May 25, 2001, after respondent had performed just over 19 more hours of work entitling him to an additional $4,750 fee, Karen paid respondent $5,000. With the $2,250 advanced on March 21, respondent had earned only $2,500 of the May 25th payment of $5,000. Notwithstanding this, respondent still deposited the entire $5,000 check in his business operating account.

{¶ 7} Respondent testified that the case was difficult and time-consuming because of Karen's involvement. According to respondent, Karen's behavior was frequently demanding and unpredictable. He said that on two occasions, Karen had to be escorted from the grounds of Maple Knoll because of her angry exchanges with Maple Knoll personnel and that Karen was later barred from the premises.

{¶ 8} Karen also called respondent often and at all hours, repeatedly ordering him to file meritless suits against Maple Knoll. Respondent resisted these requests because Barbara had advised him that she did not want to leave Maple Knoll. At the hearing, respondent related that he was the sixth in the series of attorneys who had been retained for Barbara's mother. Eventually, he also became the eighth attorney, after having been fired and rehired.

{¶ 9} After many meetings with Maple Knoll doctors and administrators, respondent gained permission to have Barbara moved into assisted living. Just prior to the transfer, however, Karen moved her mother to a different facility, where Barbara died.

{¶ 10} After firing respondent for the second time, Karen appeared at his office to retrieve her mother's file. Respondent testified that his secretary felt threatened and in his absence gave the file to Karen without first making a copy. Karen thereafter sent a letter requesting an itemized bill and a refund of any unearned portion of the $10,000 fee. Respondent claimed that because the records of the time he had spent on the case were in the case file, he was unable to provide the itemized bill.

{¶ 11} To respond to the alleged ethics violations, however, respondent reconstructed the time records to the best of his ability from his day planner and other sources and estimated that he had provided legal services worth $13,250. His estimates confirm that at the time the last two payments were received and deposited, respondent had not earned those fees in full. Nor did respondent ever account to Barbara for paying himself the fees he had received on her behalf.

{¶ 12} During the investigation of this case, relator subpoenaed respondent's trust-account and operating-account records. The records revealed that respondent frequently made cash withdrawals from his trust account, using an automat-

ic teller machine and by writing counter checks to cash. Respondent acknowledged that he kept money in the trust account as a reserve in case of a fee dispute for which he needed to make a refund, apparently having deposited these sums from the flat fees he received in criminal cases. Respondent thus conceded that he had made the identified withdrawals but told the panel that he considered the funds in the trust account his money. Respondent further stipulated to having "failed to keep contemporaneous accounts/records in order to be able to determine which funds being withdrawn from his [trust] account [were] to be debited [from] any one client's trust account deposits."

{¶ 13} Respondent explained that in charging a flat fee, he always informed his clients by way of his new-client information sheet that "attorney fees are deemed earned upon receipt." Respondent claimed that this arrangement had been recommended at a continuing legal education seminar. Respondent also testified that he kept time records inside the file for every case so that he could account for his time in a fee dispute.

{¶ 14} Because a trust account may contain only client funds, funds belonging to both the client and the attorney, and funds sufficient to pay bank charges, the panel found by clear and convincing evidence that respondent had violated DR 9-102(A). Specifically, respondent had placed two payments directly into his operating account rather than withdrawing those amounts from his trust account as earned. Second, respondent used the trust account as a fund from which to resolve fee disputes and considered the trust-account money his own. The panel further found that respondent had violated DR 9-102(B)(3) because he had not properly identified the funds in his trust account and often made cash withdrawals from that account without appropriate record keeping.

{¶ 15} Relator did not charge a violation of DR 2-106(A) (prohibiting an attorney from collecting an excessive fee), and the panel did not find this misconduct; however, the panel was still troubled by respondent's practice of informing clients that his fees were earned upon receipt. This practice implied that respondent's fees were nonrefundable, a practice contrary to *Columbus Bar Assn. v. Klos* (1998), 81 Ohio St.3d 486, 489, 692 N.E.2d 565, and the rule that on discharge or withdrawal, an attorney is entitled to be paid "only for the services rendered and related expenses," not a "windfall." Fees received in a civil case must be held in trust until earned. And as the board observed, a flat fee received in a criminal case may be deposited directly into the attorney's operating account, but provisions must be made for refunding all or part of the fee in the event of a discharge or withdrawal so that the attorney's fee is not excessive. See Bd. of Commrs. on Grievances and Discipline Advisory Opinion No. 96-4 (1996).

## Sanction

{¶ 16} In recommending a sanction for this misconduct, the panel considered the aggravating and mitigating features of respondent's case. See Section 10 of

the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline. The panel found that respondent had no prior disciplinary record, was cooperative in the disciplinary process, and has no mental disability or chemical dependency. Moreover, as the parties agreed that respondent's misconduct involved poor accounting practices only, the panel did not find that his misconduct had resulted from self-interest.

{¶ 17} Respondent proved his determination to avoid bookkeeping problems in the future. To improve his office accounting system, he has hired a certified public accountant ("CPA") to handle his financial affairs, implemented the system that his CPA recommended for tracking client funds, and canceled the ATM card for his trust account. He has since placed only client funds, most of which he holds in trust in order for his clients to make any ordered restitution, in his trust account.

{¶ 18} The panel thus found that respondent sincerely intends to remedy his situation and to avoid further embarrassment and disgrace. Finally, the panel found that although his client was elderly, disabled, and particularly vulnerable, there was inadequate proof that she had sustained any harm as a result of respondent's actions.

{¶ 19} The panel recommended, consistent with the parties' suggested sanction, that respondent be suspended from the practice of law for a period of six months but that the entire suspension be stayed on the following conditions: (1) respondent must continue to consult with an accountant to improve his accounting practices and system for tracking client funds and (2) respondent's practice must be monitored for a period of one year by an attorney, appointed by relator, who is experienced in properly handling the funds of both criminal defense and civil causes of action. The panel further recommended that Karen's claim be referred to relator's committee on fee disputes for further investigation.

{¶ 20} The board adopted the panel's findings of misconduct but recommend a six-month actual suspension, finding that given the particular vulnerability of the client and her daughter, respondent had acted in his own interests and "disregarded his duties to his client and profession."

{¶ 21} Upon review, we agree that respondent violated DR 9–102(A) and 9–102(B)(3), as found by the board. We reject, however, the board's rationale for imposing a six-month actual suspension. Relator has provided no evidence of specific harm to respondent's client, whom he served with some success under trying circumstances. And if the amount of respondent's fee is in controversy, that issue may be submitted, as the panel recommended, to relator's fee-dispute committee for resolution.

{¶ 22} Because of these considerations and the mitigating features, we find this case most comparable to *Cincinnati Bar Assn. v. Trainor*, 99 Ohio St.3d 318, 2003-Ohio-3634, 791 N.E.2d 972, in which another attorney violated DR 9–102(A) and (B) by losing track of disbursements from the proceeds from a client's settlement. That attorney's poor accounting and management skills, which resulted in overpayments to the client of $12,000, were obviously not motivated by greed. His misconduct thus warranted only a stayed six-month suspension. Similarly, the evidence of this respondent's misconduct suggests that he acted by mistake, not selfishness.

{¶ 23} Accordingly, respondent is hereby suspended from the practice of law in Ohio for six months; however, the entire suspension period is stayed on the conditions that (1) respondent continue to consult with an accountant to improve his accounting practices and system for tracking client funds and (2) respondent's practice be monitored for a period of one year by an attorney, appointed by relator, who is experienced in properly handling the funds from both criminal defense and civil causes of action. If respondent violates either condition of the stay, the stay will be lifted, and respondent will serve the entire six-month suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

PFEIFER, J., dissents and would suspend respondent for six months.

---

James F. Brockman, for relator.

Clayton G. Napier, for respondent.