John A. Lord, pro se.

COLUMBUS BAR ASSOCIATION *v.* FARMER.

[Cite as *Columbus Bar Assn. v. Farmer,*
111 Ohio St.3d 137, 2006-Ohio-5342.]

(No. 2006–0491—Submitted June 7, 2006—Decided November 1, 2006.)

**Per Curiam.**

{¶ 1} Respondent, Derek A. Farmer of Gahanna, Ohio, Attorney Registration No. 0071654, was admitted to the practice of law in Ohio in 1999. On December 9, 2004, relator, Columbus Bar Association, charged respondent in an amended complaint with violations of the Code of Professional Responsibility. Respondent answered, and a panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of misconduct and a recommendation, which the board adopted.

{¶ 2} The panel found misconduct in connection with two of the three counts charged in the complaint but unanimously dismissed the allegations in Count One. Relator concedes that under Gov.Bar R. V(6)(H), the panel's unanimous dismissal and decision not to refer Count One to the board for further review disposed of those charges. We do not review such dismissals. *Cuyahoga Cty. Bar Assn. v. Marosan,* 109 Ohio St.3d 439, 2006-Ohio-2816, 848 N.E.2d 837, ¶ 13.

{¶ 3} Thus, pursuant to Gov.Bar R. V(8)(D), we review the board's findings of misconduct as to Counts Two and Three, to which respondent objects; the board's recommended sanction, to which relator objects; and respondent's further objection to the board's recommendation to award costs.

*Count Two—Martin*

{¶ 4} On April 23, 2001, members of Charles Martin's family consulted respondent about his possibly taking over in the appeal of Martin's criminal conviction. Martin's mother, brother, and particularly his sister, Teresa Smith, believed in Martin's innocence.

{¶ 5} Martin had been indicted in May 2000 by the Montgomery County Grand Jury on felony charges, including aggravated murder, attempted aggravated murder, aggravated robbery, and rape, in the shooting death of a woman and the shooting of her sister, who lived to testify against Martin. Then represented by two experienced Dayton criminal defense attorneys, Martin was convicted in December 2000 and was sentenced to life in prison plus 55 years.

{¶ 6} The court appointed new counsel to appeal Martin's conviction to the Montgomery County Court of Appeals. That attorney had timely filed Martin's appellate brief on April 19, 2001, asserting two assignments of error. He argued (1) that the verdict was against the manifest weight of the evidence and not substantiated beyond a reasonable doubt and (2) that the trial court unjustifiably sentenced Martin to maximum and consecutive prison terms due to ineffective assistance of counsel.

{¶ 7} Smith testified that during their initial meeting, respondent told the Martin family that if hired, he would need to write and file a new brief. During a second or third meeting, Smith recalled respondent's saying that he had reviewed the April 19 brief and that the brief "wasn't worth the paper it was written on." Respondent also promised that his new brief would be "in-depth and it would cover the things that were necessary."

{¶ 8} Respondent led the Martin family to believe during their meetings that he would definitely be able to obtain Martin's early release from prison. This claim was an implausible boast, given the case against Martin, which included not only a victim's but also another witness's testimony identifying him as the perpetrator. The Martin family retained respondent based on his claims, and although no one ever signed a fee agreement, the mother eventually promised to pay a later quoted $41,000 "flat fee." Between May 3, 2001, and July 23, 2002, the Martin family paid respondent in installments a total of $8,915.

{¶ 9} Respondent promptly filed an appearance on Martin's behalf in the court of appeals and was granted leave to withdraw the April 19 brief. Respondent admitted that he had not at that time read his predecessor's brief.

{¶ 10} Respondent visited Martin the first time at the Madison Correctional Institution on May 10, 2001. According to Martin, respondent repeated during that meeting the exaggerated claims he had previously made to Martin's family. Martin recalled respondent's saying that he could "beat this case" and get Martin

out of prison. According to Martin, respondent also said that he had reviewed the appellate brief already filed by Martin's appointed counsel, that the brief "wasn't worth the paper it was written on," and that the author "should be ashamed" for writing it. Respondent told Martin that he was going to withdraw the April 19 brief and file a more effective brief.

{¶ 11} On August 3, 2001, respondent filed another brief in support of Martin's appeal. Respondent did not tell Martin or his family, but his August 3 brief was, in all substantive respects, a nearly verbatim recasting of his predecessor's April 19 brief. Respondent added no new assignments of error and tracked the analysis of the two assignments in the first brief almost word for word. With two exceptions, respondent's brief also cited exactly the same cases as had his predecessor, and his "Statutes and Other Authorities Cited" section was identical, including the same erroneously cited statute.

{¶ 12} On comparing the two briefs, Smith soon realized that respondent had not produced the new and improved brief that had been promised. Smith, a nurse, who had taken a second job to help pay respondent's fee, testified that she angrily confronted respondent, and he apologized. Respondent explained that he "had been up working late on another case and * * * the time to file [the brief] was * * * fast approaching. And he didn't get an opportunity to really * * * get in-depth like he said that he would."

{¶ 13} In his own formal defense, however, respondent reported that he had met with Martin's first appellate counsel and had studied the trial transcript and that his research had convinced him that Martin's release from prison would be better pursued in postconviction proceedings than on appeal. Respondent purportedly also decided that the April 19 brief adequately argued his client's case after all and that rewriting it was neither necessary nor economical. Smith denied that respondent ever offered her these explanations. She also testified that the Martin family had regrettably continued to send respondent money based on his promises, including that he would take Martin's case "through the different levels of the court system" or as respondent repeatedly described it, "all the way to the Supreme Court of the United States."

{¶ 14} The court of appeals affirmed Martin's convictions but remanded the case to the sentencing court for clarification of the rationale for imposing maximum and consecutive sentences. *State v. Martin* (Dec. 28, 2001), Montgomery App. No. 18652, 2001 WL 1658140. On February 11, 2002, before the trial court had ruled on remand, respondent appealed to this court, filing a memorandum in support of jurisdiction. The prosecutor moved to dismiss for lack of a final, appealable order, but the trial court reaffirmed Martin's sentence before any ruling on the motion. We did not accept Martin's appeal for review. *State v. Martin*, 95 Ohio St.3d 1458, 2002-Ohio-2230, 767 N.E.2d 1177.

{¶ 15} By late 2002, Martin and his family had become frustrated with respondent's lack of progress and false promises, including that respondent was going to hire an investigator to see whether the second witness to Martin's identity would recant her testimony and that he would then file for postconviction relief or a new trial. Martin wrote a letter discharging respondent on December 10, 2002. His mother called respondent and followed up with a letter on December 30, 2002, asking for the return of Martin's paperwork, an accounting of the family's fees, and a refund of all unearned sums.

{¶ 16} On January 2, 2003, respondent advised Martin by letter that discharging him would be a "mistake" because "someone" had been in contact with the second identifying witness, and respondent thought that that witness was "now willing to tell the truth." In another letter, respondent made the same representation to Martin's mother and sister. Responding to the mother's request for a refund, respondent also advised that because he had charged a flat fee, he did not have a list of his hours and would have to reconstruct an itemized bill. Respondent, who then did not keep track of his time in any of his cases, was unable to produce an account of his earnings in Martin's case. Respondent continues to claim, however, that he earned the entire $8,915 fee and more.

{¶ 17} About the time of respondent's dismissal, a third party filed a grievance with the Disciplinary Counsel about the duplicate brief that respondent had filed in Martin's appeal. In November 2003, Martin filed the grievance that led to the formal complaint in this case. Disciplinary Counsel did not pursue formal charges against respondent, in part because of representations in his October 13, 2003 reply to a letter of inquiry. There, respondent recounted work that he claimed to have performed for Martin and falsely represented that he had "obtained the assistance of" an investigator to find and question exculpatory witnesses. He added that the Martins were not entitled to a refund because they had agreed to pay a flat fee and had dismissed him prematurely. Respondent's reply also defended his decision to copy the April 19 brief as being the most efficient reaction to his research in the case.

{¶ 18} By these acts and omissions, the panel and board found that respondent had violated DR 1–102(A)(4) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation), 1–102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on his fitness to practice law), 2–106(A) (prohibiting a lawyer from charging or collecting a clearly excessive fee), 6–101(A)(2) (prohibiting a lawyer from attempting to represent a client without adequate preparation), and 9–102(B)(3) (failing to render appropriate accounts to his client).

{¶ 19} Respondent disputes these findings of misconduct, arguing that none of them were established with the clear and convincing evidence that Gov.Bar R.

V(6)(J) requires. Respondent further argues that the DR 1–102(A)(4) violations, found by the panel and board in part because of respondent's representations in the October 13, 2003 reply to the Disciplinary Counsel, were not specifically charged as such in relator's complaint. Claiming insufficient evidence and a violation of due process, and arguing that this case is really nothing more than two simple fee disputes that should be resolved through arbitration, respondent urges us to dismiss all charges against him.

DR 1–102(A)(4)

{¶ 20} The panel and board found that respondent had acted dishonestly and in violation of DR 1–102(A)(4) by dismissing as worthless the April 19 brief and then filing a duplicate version. Respondent vigorously objects, claiming that he did not have access to and thus could not possibly have read either the April 19 brief or the record at the times he supposedly disparaged the brief. He "would have to be crazy," his argument continues, to promise either that he could write a better brief than his predecessor or could obtain freedom for his client without having done this research. Pitting his own credibility against theirs, respondent insists that Martin and his sister were lying about his promises and puffery.

{¶ 21} Admittedly, Martin's credibility is suspect. His attempts, after discharging respondent, to obtain a new trial and postconviction relief based on obviously fabricated affidavits destroyed any shred of believability he ever may have had. The panel's confidence in Smith's testimony, however, deserves deference, and we consider this evidence clear and convincing. See *Cincinnati Bar Assn. v. Statzer,* 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8 ("we ordinarily defer to a panel's credibility determinations in our independent review of professional discipline cases unless the record weighs heavily against those findings").

{¶ 22} Smith, a deeply devout, direct, and unguarded witness, repeatedly recalled respondent's promise to write a new brief, one that explored details that she thought had been wrongly overlooked during her brother's trial, and her dismay upon learning that he had not. Just as consistently, Smith reported respondent's excuses—he was up against a filing deadline and had needed to work on another case—when she called on him to account for his dereliction. These excuses, unflattering as they are, are far more believable than respondent's explanation to the Disciplinary Counsel that he had, after careful research and contemplation, decided that Martin's appeal would be best served by essentially plagiarizing his predecessor's work.

{¶ 23} Moreover, Smith may have thought that respondent had read the April 19 brief before promising revisions, but it does not matter either way to us. Judging merely from his promises and excuses to Smith, it is obvious that respondent will say at any given time whatever he thinks will appease his listener

or advance his interests, truth notwithstanding. Indeed, his hearing testimony was replete with evasive and effusive double-talk, no matter who was asking the question, when responding to even the simplest questions. We are convinced, therefore, that respondent would have exaggerated his advocacy skills and any prospects for success regardless of whether the claims were justified. Thus, we also credit Smith's testimony and hold that respondent violated DR 1–102(A)(4) by overpromising to perform in a way that would persuade the Martin family to retain him and continue to pay for his services.

{¶ 24} Respondent also objects to the panel's and board's findings that he violated DR 1–102(A)(4) by misleading Disciplinary Counsel as to why he copied the April 19 brief and whether he had in reality hired an investigator as he represented.

{¶ 25} We agree that while relator's complaint accused respondent of misleading members of the Martin family in these respects, it did not charge that respondent had also attempted to so mislead Disciplinary Counsel. Without such prior notice, these claims cannot form the basis for adjudicating additional DR 1–102(A)(4) misconduct. *Cuyahoga Cty. Bar Assn. v. Judge,* 96 Ohio St.3d 467, 2002-Ohio-4741, 776 N.E.2d 21, ¶ 4; see, also, *Disciplinary Counsel v. Simecek* (1998), 83 Ohio St.3d 320, 322, 699 N.E.2d 933, quoting *In re Ruffalo* (1968), 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed.2d 117 (disciplinary charges "'must be known before the proceedings commence'" and cannot be amended based on the testimony of the accused). Accordingly, we do not find additional violations of DR 1–102(A)(4).

DR 1–102(A)(6)

{¶ 26} Having found that respondent deliberately misled Smith as to what he could and would do for her brother, we also find clear and convincing evidence that respondent's conduct reflected adversely on his fitness to practice law in violation of DR 1–102(A)(6).

DR 6–101(A)(2)

{¶ 27} The panel and board further found that respondent had tried to represent Martin without adequate preparation under the circumstances, a violation of DR 6–101(A)(2), by failing to properly research Martin's case before promising results and quoting a $41,000 fee.[1] Respondent objects, insisting that he cannot be faulted as a lawyer for believing in his convicted client's claimed innocence and promising a corresponding defense strategy. We disagree. No

---

1. The panel and board also seemed to find that $41,000 was per se an excessive fee to charge for exhausting Martin's appellate, postconviction, and other remedies. We do not go so far, as no clear and convincing evidence establishes that fees in this amount are never justified for such representation.

matter how much defense counsel wants to believe in a client's account of events underlying a conviction, the lawyer must not use false hope to take financial advantage of the client and trusting supporters as respondent did in this case.

{¶ 28} Respondent swept the Martins up and strung them along, promising an improved brief and investigation to justify postconviction proceedings or a motion for new trial. The Martins continued to pay installments of almost $9,000, but after nearly two years of disappointment, they gave up. Even then, respondent tried to entice them back by implying that he had hired an investigator and had finally landed the exculpatory evidence for which they had been waiting. For making promises to Martin and his family before he could gauge the realistic possibilities, we find respondent in violation of DR 6–101(A)(2).

DR 2–106(A) and 9–102(B)(3)

{¶ 29} DR 2–106(A) prohibits a lawyer from collecting a clearly excessive fee, and a violation necessarily results whenever a lawyer obtains payment from a client but provides no service or other benefit in return. See, e.g., *Columbus Bar Assn. v. Halliburton–Cohen*, 106 Ohio St.3d 98, 2005-Ohio-3956, 832 N.E.2d 42 (retention of "lost opportunity" fee, delay in refunding unearned fees, failure to account for billable hours, and failure to repay entire amount of overcharge to client warranted six-month suspension from practice of law, stayed on conditions). To ensure that lawyers do not overcharge, DR 9–102(B)(3) correspondingly requires a lawyer to "[m]aintain complete records of all funds * * * of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

{¶ 30} Respondent did not provide Martin or his family even an estimated account of the time he had spent in the Martin case, but he denies having collected an excessive fee. He also insists that he is in full compliance with DR 9–102(B)(3), which he claims does not require that lawyers document their time, because he provided receipts for the money he received and because he "stands ready to refund all or part of the fees in question" either in response to our order or as determined in arbitration. We strongly disagree.

{¶ 31} A lawyer may retain only the reasonable value of legal services actually rendered prior to the lawyer's discharge or withdrawal from representation during an ongoing legal dispute. *Reid, Johnson, Downes, Andrachik & Webster v. Lansberry* (1994), 68 Ohio St.3d 570, 576, 629 N.E.2d 431; *Roberts v. Hutton*, 152 Ohio App.3d 412, 2003-Ohio-1650, 787 N.E.2d 1267, at ¶ 37. Upon a lawyer's discharge or withdrawal, therefore, the duty to *appropriately* account requires a prompt and reliable report to the client of the work performed and any remaining unearned fees. The explanation must be given to ensure that the fee is not excessive and a windfall. *Cincinnati Bar Assn. v. Witt*, 103 Ohio St.3d 434, 2004-

Ohio-5463, 816 N.E.2d 1036, ¶ 15 (a flat fee collected in a criminal case may be deposited directly into an attorney's operating account, but "provisions must be made for refunding all or part of the fee in the event of a discharge or withdrawal so that the attorney's fee is not excessive").

{¶ 32} Upon discharge or withdrawal, a lawyer may also recover from a client the reasonable value of the services rendered under the doctrine of quantum meruit, which literally entitles the lawyer to "as much as [is] deserved." Black's Law Dictionary (8th Ed.2004) 1276; see, also, *Fox & Assoc. Co., L.P.A. v. Purdon* (1989), 44 Ohio St.3d 69, 541 N.E.2d 448, syllabus. To this end, DR 2–106(B) lists factors for determining the value of services rendered, including the time, labor, and skill required by the representation and the rate customarily charged in the locality for such services. DR 2–106(B)(1) and (3). But whether the lawyer claims client money already in his or her possession or pursues payment through legal action, the lawyer still has the responsibility to accurately justify the reasonable value of charged legal fees to establish entitlement. See, e.g., *Reid*, 68 Ohio St.3d at 576, 629 N.E.2d 431, fn. 3; *Watterson v. King*, 166 Ohio App.3d 704, 2006-Ohio-2305, 852 N.E.2d 1278, ¶ 16.

{¶ 33} Thus, although DR 9–102(B)(3) does not require that lawyers keep contemporaneous time records of the work they perform for a client, this practice is recommended. See Recommendation of the Council of Delegates, Ohio State Bar Assn., Model Rule 1.5 as proposed by the Supreme Court Task Force on Rules of Professional Conduct (Nov.2005). The failure to concomitantly document time spent on a case, on the other hand, does not diminish the duty to appropriately account for client funds upon discharge or withdrawal. In those situations, the lawyer may be left with having to reconstruct his or her hours from memory and collateral corroborating records, but the explanation must nevertheless be provided as promptly and reliably as possible.

{¶ 34} Respondent has reconstructed in his brief the services he provided on Martin's behalf, but he still has not provided even the roughest estimate of how much time he devoted to each task. Moreover, although independent evidence exists to corroborate that respondent appeared in court; filed papers; intermittently conferred with Martin, his family, and others; and reviewed various documents generated in the Martin case, little other than respondent's disjointed testimony was offered to prove the witness interviews and legal research that he cites in partial justification of his fee. With the exception of a legal assistant's vague recollection of respondent's meetings with a woman who he thought could persuade one eyewitness to recant, respondent has no notes, recordings, memoranda, or other materials to document his interviews and research. Without this documentation, we cannot trust respondent, with his penchant for exaggeration, to account for his services with any degree of accuracy.

{¶ 35} Respondent has failed to provide any reliable explanation for charging the Martins nearly $9,000 in legal fees. Absent this accounting, we can only conclude that his fees were clearly excessive. We therefore agree with the panel and board that respondent violated DR 2–106(A) and 9–102(B)(3).

### Count Three—Rutledge and Moore

{¶ 36} Searcy Rutledge Jr., then represented by appointed counsel, was indicted for murder in 2000 for the stabbing death of a one-time girlfriend. In July 2001, when he was nearly age 70, Rutledge was sentenced to 15 years to life by the Montgomery County Common Pleas Court. In June 2002, Rutledge's fiancée, Stella Ysabel Moore, consulted respondent about pursuing postconviction relief for Rutledge.

{¶ 37} Respondent agreed to investigate, and at some point told Moore that he could obtain Rutledge's release from prison within seven or eight months because of Rutledge's age. In any event, Moore paid respondent $1,000. Their engagement letter advised that the initial $1,000 was nonrefundable and that respondent would require additional fees if he discovered a viable legal remedy to pursue.

{¶ 38} While Rutledge remained incarcerated, Moore also asked respondent to draft a power of attorney so that she could look after Rutledge's affairs. Respondent prepared the document, and Rutledge signed it in prison. Although respondent never commented on the viability of a legal remedy, Moore nevertheless paid respondent an additional $4,000.

{¶ 39} From June 2002 until he withdrew as Rutledge's counsel in April 2004, respondent did not file any action to secure a new trial or the client's release from prison. Respondent did, however, perform other legal services for Moore and Rutledge that he claimed were in exchange for their $5,000 fee, although he kept no records to document his time. In addition to preparing the power of attorney, respondent interviewed Rutledge in Lebanon Correctional Institution three times. He also tried to help Moore, who was on probation for an arson conviction, visit Rutledge and get money to him in prison, and he asked for a reduction in the restitution that Moore had been ordered to pay in the arson case. Moreover, respondent met with Moore on many occasions and spoke with her on the telephone.

{¶ 40} But by the end of 2003, Moore and Rutledge had become increasingly dissatisfied with the lack of progress in respondent's investigation and his unwillingness to communicate with Moore as requested. Moore signed a grievance with relator in December 2003, alleging these and other shortcomings. Moore also asked respondent to return $4,000 in fees so that she could afford to hire other counsel for Rutledge. Respondent has not properly accounted for his fees or refunded any money to these clients.

{¶ 41} By these acts and omissions, the panel and board found that respondent had violated DR 9–102(B)(3) and 9–102(B)(4) (requiring a lawyer to promptly pay a client funds to which the client is entitled).

{¶ 42} Respondent objects to both findings of misconduct, arguing that they, too, were not substantiated by clear and convincing evidence. Again, we disagree.

{¶ 43} Any attorney who fails to document his or her time and its value " 'runs the risk of being discharged and needing proof of effort in order to recover [or retain] any fee.' " *Reid,* 68 Ohio St.3d at 577, 629 N.E.2d 431, fn. 3, quoting Sloan, Quantum Meruit: Residual Equity in Law (1992), 42 De Paul L.Rev. 399, 446. Respondent gambled here and lost. His failure to keep track of any time he spent on Rutledge's postconviction proceedings and his concomitant failure to track the time he devoted to Rutledge's and Moore's other interests made any proper accounting for these clients' $5,000 fee practicably impossible.

{¶ 44} Accordingly, we also adopt the panel's and board's findings that respondent violated DR 9–102(B)(3) and 9–102(B)(4) relative to Rutledge and Moore.

Sanction

{¶ 45} The panel recommended that respondent be suspended from the practice of law for one year and that six months of this sanction be stayed on two conditions: (1) that a monitoring attorney be appointed to oversee respondent's practice during the stayed suspension and (2) that respondent be required to refund all but $1,000 of the fees collected in the Martin count and in the Rutledge/Moore count. The board similarly recommended a one-year suspension with six months stayed on the panel's conditions. Relator objects, arguing that respondent's misconduct warrants a two-year suspension with a conditional stay of no more than six months.

{¶ 46} "When deciding what sanction to impose, we consider the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and applicable precedent." *Disciplinary Counsel v. Evans* (2000), 89 Ohio St.3d 497, 501, 733 N.E.2d 609. We have already decided that respondent violated duties owed to his clients—to act with candor and competence in accordance with DR 1–102(A)(4) and 6–101(A)(2) and to protect the client's property as required by DR 9–102. He also violated his duty to the legal profession by collecting clearly excessive legal fees in violation of DR 2–106.

{¶ 47} With respect to mental state, we agree with relator that respondent deliberately misled Smith about revisions to the April 19 brief. We also fault respondent's complete lack of documentation to justify his fees, a shortcoming he attributes completely to his inexperience, but we do not. We infer from his

failure to even estimate the time he spent on the Martin and Rutledge/Moore cases that he cannot justify his charges.

{¶ 48} Relator further asserts that aggravating circumstances and precedent necessitate a more exacting sanction than recommended. We agree.

{¶ 49} The aggravating factors in this case clearly outweigh the mitigating factors. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). First, consistent with relator's argument, we agree that respondent attempted to deceive authorities during the disciplinary proceedings, an aggravating feature under BCGD Proc.Reg. 10(B)(1)(f). Like the panel and board, we doubt respondent's reconstituted explanation to Disciplinary Counsel about why he filed a duplicate version of the April 19 brief. Instead, we believe that he ran out of time, just as he told Smith. Moreover, we believe that to throw off disciplinary authorities, respondent carefully insinuated that he had hired an investigator. These falsehoods certainly exacerbate the misconduct committed in this case, even though due process precludes finding a Disciplinary Rule violation on this basis.

{¶ 50} To establish his reputation and character, mitigating factors under BCGD Proc.Reg. 10(B)(2)(e), respondent presented the testimony of numerous witnesses, all extremely credible. A Cuyahoga County Common Pleas judge and two United States District Court judges testified to respondent's competence. Four other witnesses related respondent's invaluable assistance in various prisoner-advocacy and other outreach projects throughout the state and country.

{¶ 51} These witnesses were impressive, and their confidence in respondent is the principal reason that we do not impose an even greater sanction than we have chosen. Respondent's field of practice is important to the legal system. But he must be prepared to scrupulously protect the interests of his clients, who are usually of modest means, education, and sophistication, and therefore are among the law's most vulnerable. We have seen that, for now, he is not so prepared.

{¶ 52} Of the cases cited by the parties, *Columbus Bar Assn. v. Wolfrom* (1998), 83 Ohio St.3d 1, 697 N.E.2d 593, and *Columbus Bar Assn. v. Torian,* 106 Ohio St.3d 14, 829 N.E.2d 1210, are most analogous. In both, we indefinitely suspended lawyers who, along with committing other misconduct, accepted thousands of dollars in fees from several different clients, either to defend them against criminal prosecution or to pursue their release from prison, but did not follow through on the representation or refund unearned fees on request. In fact, the lawyer in *Wolfrom* was also found in violation of DR 1–102(A)(4) and (6) for "soliciting legal work where the likelihood of providing meaningful legal services was nil." *Wolfrom,* 83 Ohio St.3d at 2, 697 N.E.2d 593. In *Torian,* we said that accepting fees and failing to provide promised services in return is

tantamount to theft of the client's money. 106 Ohio St.3d 14, 2005-Ohio-3216, 829 N.E.2d 1210, ¶ 17.

{¶ 53} Respondent insists that these cases are distinguishable because he actually provided services to his clients and was discharged before he could finish. The ethical lapses are fundamentally alike, however, as respondent neither accounted to his clients for his fees nor refunded any unearned portion. The only difference may be that respondent seemed, on some level, to have genuinely intended to help his clients.

{¶ 54} But despite this authority, we do not indefinitely suspend respondent's license to practice law. Instead, because of the testimonials to his character and competence apart from the underlying events, we exercise some lenience.

{¶ 55} Respondent is therefore suspended from the practice of law for two years; however, one year is stayed on the conditions that (1) respondent be subject to a term of probation pursuant to Gov.Bar R. V(9) and that a monitoring attorney be appointed to oversee respondent's practice during the stayed suspension and that (2) respondent refund all but $1,000, with statutory interest, of the fees collected in the Martin count and in the Rutledge/Moore count. Respondent is also ordered as a condition of the stay, over his objection, to pay the costs of this proceeding. If respondent violates or fails to comply with these conditions, the stay shall be lifted, and respondent shall serve the entire suspension period.

Judgment accordingly.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

PFEIFER and O'DONNELL, JJ., dissent and would suspend respondent from the practice of law in Ohio for one year, with six months stayed.

---

Bruce A. Campbell, Bar Counsel, and A. Alysha Clous, Assistant Bar Counsel, Terry K. Sherman, and Don Rueben, for relator.

Bieser, Greer & Landis, L.L.P., David C. Greer, and Carla J. Morman, for respondent.