## DISCIPLINARY COUNSEL v. O'BRIEN.

[Cite as *Disciplinary Counsel v. O'Brien,*
120 Ohio St.3d 334, 2008-Ohio-6198.]

(No. 2008-0812—Submitted July 22, 2008—Decided December 4, 2008.)

---

**Per Curiam.**

{¶ 1} Respondent, Kevin John O'Brien of Columbus, Ohio, Attorney Registration No. 0028108, was admitted to the bar in 1983. On August 13, 2007, relator, Disciplinary Counsel, filed a complaint charging respondent with two counts of violating the Code of Professional Responsibility, and respondent answered. A

hearing was held before a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court. The panel dismissed count two of the complaint, and relator narrowed the charge with respect to count one.

{¶ 2} In April 2008, the panel issued its findings of fact, conclusions of law, and recommendation, which the board adopted in part. The board recommends that respondent be suspended from the practice of law for six months but that the suspension be stayed on the condition that respondent commit no further misconduct. We adopt the board's findings and the recommended sanction.

## Facts

{¶ 3} At issue is respondent's conduct with respect to a client's sale of real property and his virtually simultaneous filing of a Chapter 7 bankruptcy.

{¶ 4} Respondent represented Stefan A. Unger in connection with the latter's sale of his home in Fredericktown, Ohio. After the closing, respondent took possession of the sale proceeds of $81,000 at his client's request, and on November 1, 2004, he placed the $81,000 in his client trust account. On November 8, 2004, Unger filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Ohio. Unger's attorney for the bankruptcy was Robert Bardwell, who rented office space from respondent and to whom respondent had referred Unger.

{¶ 5} Unger did not disclose the proceeds from the sale of the Fredericktown house to his bankruptcy attorney and did not include the asset in his bankruptcy petition. Respondent became aware of the bankruptcy one week after it was filed and asked Unger whether the asset had been disclosed. According to respondent, Unger told him, "Don't worry about it." Respondent discussed the proper course of action with two attorneys in his office (Bardwell was not one of them) and testified that he received advice from the late Charles W. Kettlewell Sr. Respondent testified that Kettlewell advised him that he could not, consistently with legal ethics, disclose the existence of the funds to the bankruptcy court, the trustee, or attorney Bardwell.

{¶ 6} Subsequently, respondent disbursed money out of the account at Unger's direction a total of eight times. The largest of these disbursements was $36,493.72, which respondent sent by check to a title company on Unger's behalf on December 13, 2004. Respondent also attempted to convey the remainder of the funds in the account to Unger in December 2004, but the check was marked "void" and returned to respondent.

{¶ 7} Because Unger did not disclose to the bankruptcy court the proceeds from selling his house, the trustee filed a "no asset report" with the court, and the court discharged Unger's debts on March 1, 2005. Approximately one week later, the trustee received information—apparently from a former associate of

respondent—that respondent was holding the house-sale proceeds in his client trust account. In a fax sent to respondent, the trustee in Unger's bankruptcy claimed that the funds constituted property of the trustee and demanded immediate remittance of the funds along with an accounting and documentation of the real estate sale. The trustee also withdrew the no-asset report.

{¶ 8} Upon receiving the trustee's fax, respondent took the following steps. First, he contacted two experienced attorneys, Mark Aultman and Alvin Mathews, seeking advice and representation. According to respondent, both attorneys confirmed the earlier advice given by Kettlewell. Second, respondent alerted Unger to the trustee's action and demanded that Unger turn over the funds to the trustee and admit his apparent misrepresentation. When Unger refused, respondent disclosed the presence of the house-sale funds in the trust account to Unger's bankruptcy attorney. Respondent also refused to turn over the funds remaining in the account to Unger.

{¶ 9} Following the advice he had received, respondent sent a fax to the trustee that stated, "We are unable to respond to your questions on the basis of attorney/client privilege." On May 3, 2005, the trustee transmitted another demand for the funds, this time noting that she stood "in the shoes of the debtor" with respect to the attorney/client privilege. The fax stated that if respondent did not remit the funds and tender the requested documents within ten days, the trustee would file a motion with the bankruptcy court and seek sanctions. In response, respondent sent a letter proposing, on behalf of Unger, to "resolve this matter" by having Unger agree to pay the amounts owed to creditors plus an amount as fee to the trustee by September 1. In a June 1 letter, the trustee rejected the offer and renewed her demands.

{¶ 10} On August 24, 2005, the trustee filed a motion to compel the turnover of documents and funds with the bankruptcy court. On September 19, 2005, the court granted the motion. Respondent did not comply until the trustee filed an additional motion on October 26, 2005; respondent testified that although his office had received the court order, it was misfiled by his staff. On November 29, 2005, respondent conveyed the remaining funds and documents to the trustee. He also requested, by motion, relief from paying attorney fees and costs. By then, $13,513.97 of the original $81,000 remained in respondent's client trust account. At the board hearing, the trustee testified that creditors who had filed proofs of claim had received only 97 percent of the amounts owed.

{¶ 11} Subsequently, respondent did pay fees and costs, and the matter was resolved between respondent and the trustee.

## The Violation of DR 7–102(A)(7)

{¶ 12} In connection with the foregoing conduct, relator originally charged respondent with violations of DR 1–102(A)(4) (prohibiting conduct involving

dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (prohibiting conduct prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct adversely reflecting on the lawyer's fitness to practice law), and 7–102(A)(7) (prohibiting the counseling or assisting of a client in conduct that the lawyer knows to be illegal or fraudulent).[1] At the hearing, relator dismissed the dishonesty charge under DR 1–102(A)(4).

{¶ 13} In finding a violation of the Disciplinary Rules, the board focused on the prohibition in DR 7–102(A)(7) against assisting a client in conduct that the lawyer knows to be illegal or fraudulent. The board viewed respondent's disbursement of house-sale proceeds at the direction of Unger as a violation of that prohibition.

{¶ 14} We agree with the board. The evidence showed that when respondent ordered the disbursements to be made, he was fully aware of the bankruptcy, harbored the reasonable suspicion that Unger had not disclosed the house-sale proceeds to the bankruptcy court, and had the means to inform himself. Nonetheless, the ledger for the client trust account reveals that respondent ordered eight disbursements totaling $65,189.72 after the bankruptcy filing, of which three equaling $44,927.72 went to payees other than Unger himself.[2] When asked why he made the disbursements at Unger's request under these circumstances, respondent stated, "I had no other option but to distribute the money to him." But respondent also stated that, from his initial knowledge of the existence of the bankruptcy case, he had fully "assumed" that the money in the trust account constituted an asset properly subject to ownership and control by the bankruptcy court and its trustee. As discussed, the board concluded that the house-sale proceeds constituted bankruptcy assets at the filing of the bankruptcy, and we agree with that conclusion.

{¶ 15} In spite of all these circumstances, respondent initially disbursed all but $13,500 of the funds to Unger and to third parties at Unger's direction. Only after the bankruptcy trustee discovered the funds and demanded turnover of the money did respondent adopt the different approach of refusing to disburse monies at Unger's direction.

{¶ 16} We agree with the board that respondent, by disbursing money from the client trust account at Unger's direction, provided active assistance to Unger's evasion of the bankruptcy laws in violation of DR 7–102(A)(7). We also agree

---

1. In certain instances, DR 7–102(B)(1) contravenes client confidentiality and requires a lawyer to reveal a fraud perpetrated by a client if the client will not do so himself. Because relator did not charge this violation, the propriety of respondent's conduct under this provision is not before us. See *Columbus Bar Assn. v. Farmer,* 111 Ohio St.3d 137, 2006-Ohio-5342, 855 N.E.2d 462, ¶ 25 (misconduct not charged cannot be adjudicated in a disciplinary proceeding).

2. We note that in December 2004, respondent attempted to convey the remainder of the proceeds to Unger, but the check was voided and returned.

that respondent's conduct was not excused by his belief that the attorney-client privilege prohibited him from disclosing the existence of the house-sale proceeds. Quite simply, respondent could have acted with consistency by *not disclosing* but also *not disbursing* the funds at Unger's direction. Although respondent rejected this course of action initially, he embraced it after the bankruptcy trustee learned of the house-sale proceeds.

{¶ 17} Finally, we note that respondent's improper assistance to Unger with respect to the bankruptcy proceeding led to a depletion of the proceeds from the sale of the house that caused actual harm to Unger's creditors: the bankruptcy trustee testified that the creditors lost three percent of their claims because of insufficient assets in the bankruptcy estate. All these circumstances justified the finding of a violation of DR 7–102(A)(7) as well as DR 1–102(A)(5) and (A)(6).

### The Propriety of the Sanction

{¶ 18} Having found a violation of DR 7–102(A)(7) and concomitant violations of DR 1–102(A)(5) and (6), the board proceeded to determine the proper severity of the sanction. In this regard, the board determined that respondent's refusal to admit wrongdoing was offset by the fact that respondent had sought and relied on legal advice with respect to the assertion of the attorney–client privilege. The board found that reliance on legal advice did not have any further mitigating effect as to the improper disbursement of house-sale proceeds, because respondent apparently did not seek advice regarding the disbursement issue. The board additionally found mitigation in the absence of any selfish motive on respondent's part and in the character testimony offered by the Honorable James Green of the Franklin County Municipal Court.

{¶ 19} We agree with the board's analysis of the factors presented. In particular, we look to two cases to evaluate the proper sanction in this case. In *Cincinnati Bar Assn. v. Wallace* (1998), 83 Ohio St.3d 496, 700 N.E.2d 1238, the attorney had assisted her client in filling out interrogatories in connection with contempt proceedings for failure to pay child support. Assisted by the attorney, the client quit-claimed his interest in a house to his current wife; the deed was executed the day after the attorney received the interrogatories, which demanded that the client identify, among other things, any interest he owned in real property. The quitclaim deed was recorded a week later. Ultimately, the attorney helped the client fill in "none" where identification of real property interests was requested. Originally charged with violating DR 7–102(A)(7) (among other provisions) for assisting in a fraudulent conveyance, the fraudulent character of the conveyance was not proved, and the attorney was found to have violated only DR 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law). That violation stemmed from assisting the client in concealing the real property interest on the responses to interrogatories.

{¶ 20} The court adopted the recommended sanction of a public reprimand. The court observed that "[a]lthough respondent could not disclose client confidences, she could have disclosed the publicly recorded deed to opposing counsel, after advising her client of her intention to do so." *Wallace,* 83 Ohio St.3d at 500, 700 N.E.2d 1238. Also significant was the fact that the attorney had received "no personal gain" and that "no party suffered any permanent financial harm" from the violation. Id. at 498, 700 N.E.2d 1238.

{¶ 21} While in the present case Unger's concealment of the house-sale proceeds, assisted by respondent's disbursement of funds to third-party creditors, conferred no financial benefit on respondent, respondent's disbursements did inflict harm on the creditors of the bankruptcy estate who could not fully collect on their claims. The six-month stayed suspension reflects the greater severity of the violation and the harm in this case.

{¶ 22} In *Disciplinary Counsel v. Frenden* (1996), 74 Ohio St.3d 601, 660 N.E.2d 1152, we imposed a six-month suspension (without stay) when an attorney had obtained the client's release from probation by actively representing to a judge that the client had never been in trouble apart from the underlying violation—even though the attorney knew that another arrest warrant had been issued against the client for a separate offense. For this failure to disclose, the attorney stipulated to a violation of DR 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice). The attorney had previously received a public reprimand in 1985.

{¶ 23} By contrast with the present case, the attorney in *Frenden* was directly involved in perpetrating the misrepresentation to the court and had received discipline previously in the form of a public reprimand several years before. These points of contrast justify the stay of the six-month suspension in this case.

{¶ 24} Finally, we note the material differences between the present case and *Columbus Bar Assn. v. Wright* (1991), 58 Ohio St.3d 126, 568 N.E.2d 1218. In *Wright,* the attorney involved himself in a bankruptcy proceeding in which a client had failed to disclose assets, and the attorney received a two-year suspension with 18 months stayed. The attorney's involvement in *Wright* was much more direct than the respondent's in this case—the attorney attended a creditor's meeting and remained silent despite knowing that the client was concealing assets. The violations in *Wright* included DR 1–102(A)(4). By contrast, respondent in this case did not involve himself in the bankruptcy, and relator dismissed the DR 1–102(A)(4) charge at the hearing.

{¶ 25} For all the foregoing reasons, we adopt the board's analysis and its recommended sanction of a six-month suspension, with all six months stayed on the condition that respondent commit no further misconduct during the stayed

suspension. If respondent violates this condition, the stay will be lifted, and respondent will serve the entire six-month suspension.

{¶ 26} Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

———————

Jonathan E. Coughlan, Disciplinary Counsel, and Stacy Solochek Beckman, Assistant Disciplinary Counsel, for relator.

Kegler, Brown, Hill & Ritter Co., L.P.A., Christopher J. Weber, Geoffrey Stern, and Rasheeda Z. Khan, for respondent.