MACHERET, Appellant,

v.

STATE MEDICAL BOARD OF OHIO, Appellee.

[Cite as *Macheret v. State Med. Bd. of Ohio*, 188 Ohio App.3d 469, 2010-Ohio-3483.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 09AP–849.

Decided July 27, 2010.

470

Collis, Smiles & Collis, L.L.C., and Elizabeth Y. Collis, for appellant.

Richard Cordray, Attorney General, and Melinda Snyder Osgood, Assistant Attorney General, for appellee.

KLATT, Judge.

{¶ 1} Appellant, Leonid Macheret, appeals from a judgment of the Franklin County Court of Common Pleas affirming the decision of appellee, the State Medical Board of Ohio, to suspend Macheret's certificate to practice medicine and surgery for an indefinite period, but not less than one year. For the following reasons, we affirm.

{¶ 2} On August 9, 2007, the board sent Macheret a notice of its intent to determine whether to take disciplinary action against him. The notice alleged that Macheret had engaged in sexual contact with Patient 1[1] without first terminating the physician-patient relationship. Additionally, the notice alleged that Macheret had falsely stated in his deposition and in responses to interrogatories that he had terminated the physician-patient relationship before engaging in sexual contact with Patient 1. According to the notice, Macheret's conduct constituted: (1) "[m]aking a false, fraudulent, deceptive, or misleading statement * * * in relation to the practice of medicine and surgery" in violation of R.C. 4731.22(B)(5), (2) "[a] departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances" in violation of R.C. 4731.22(B)(6), (3) a "violation of any provision of a code of ethics of the American medical association" in violation of R.C. 4731.22(B)(18), and (4) a "[f]ailure to cooperate in an investigation conducted by the board * * *, including * * * failure to answer truthfully a question presented by the board at a deposition or in written interrogatories" in violation of R.C. 4731.22(B)(34).

{¶ 3} Macheret requested a hearing. During the two-day hearing, Patient 1 testified that she had sought treatment from Macheret for her insomnia, fatigue, and lower back pain. Macheret diagnosed Patient 1 with intermittent hypoglycemia, multiple food allergies and food sensitivities, and intestinal candida. To treat those conditions, Macheret prescribed a regimen of supplements and IV

---

1. Throughout these proceedings, the pseudonym "Patient 1" has been used to preserve the privacy of the patient in question. We will continue that practice.

injections containing vitamins and minerals. From December 1999 through July 2000, Patient 1 visited Macheret's office approximately every other week to receive the IV injections.

{¶ 4} Patient 1 fell in love with Macheret, and she confessed her feelings to him in late June 2000. Following this revelation, Patient 1 and Macheret met for coffee at a café. According to Macheret, during this meeting, he told Patient 1 that "[s]he was starting to come too close" to him and that he could no longer be her physician. Macheret claimed that Patient 1 asked him to continue treating her for one month to give her time to find another physician. Patient 1 denied that this conversation ever occurred.

{¶ 5} Throughout July 2000, Patient 1 attended her regularly scheduled appointments with Macheret. After the July 26, 2000 appointment, Patient 1 and Macheret met at Macheret's house, and Patient 1 cooked him dinner. Later that night, Patient 1 and Macheret had sexual intercourse.

{¶ 6} On August 1, 2000, Patient 1 visited Macheret's office without an appointment. She received an IV injection and met with Macheret in an examining room.

{¶ 7} When Patient 1 and Macheret talked in subsequent telephone calls, Macheret was curt and distant. Patient 1 asked to him to meet with her, but he put off seeing her. Hurt by Macheret's apparent disinterest in her, Patient 1 called him and told him that she did not want to see him again.

{¶ 8} Despite Patient 1's resolve to end her relationship with Macheret, she saw him one last time. Patient 1 injured her back while exercising, and she recalled that Macheret had treated a prior back injury with an injection that had immediately relieved her pain. Patient 1 made an appointment with Macheret, and he gave her a spinal injection.

{¶ 9} Wracked with guilt, Patient 1 soon thereafter told her husband about her sexual encounter with Macheret. Patient 1's husband reported Macheret's conduct to the Cincinnati Academy of Medicine, which referred the matter to the board. During the board's subsequent investigation, Macheret answered interrogatories and gave a deposition. In both, Macheret admitted that he and Patient 1 had engaged in sexual intercourse. Macheret, however, asserted that he had terminated the physician-patient relationship orally and in writing prior to having sex with Patient 1. At the hearing, Patient 1 disputed Macheret's assertion. She testified that Macheret had never told her that he could no longer be her physician and that she had never received anything in writing that indicated that Macheret wanted to end the physician-patient relationship. According to Patient 1, she—not Macheret—terminated their physician-patient relationship.

{¶ 10} To support his version of the facts, Macheret called Cindy S. Hemme, his former medical assistant, to testify. Hemme recalled mailing Patient 1 two letters in which Macheret instructed Patient 1 to seek a new physician. Hemme said that she sent those letters in September or October 2000. However, Macheret's medical records for Patient 1 did not contain copies of either letter.

{¶ 11} In his report and recommendation, the hearing examiner found that Macheret was not credible when he testified that he had severed the physician-patient relationship prior to having sex with Patient 1. The hearing examiner believed, instead, Patient 1's testimony about the events surrounding the sexual encounter. Consequently, the hearing examiner concluded that Macheret had engaged in the conduct alleged in the notice of intent and that discipline was warranted under R.C. 4731.22(B)(5), (6), (18), and (34). The hearing examiner recommended that the board (1) permanently revoke Macheret's certificate to practice, but stay the revocation, and (2) suspend Macheret's certificate for an indefinite period, but not less than 180 days.

{¶ 12} At the December 10, 2008 board meeting, the board considered the hearing examiner's report and recommendation. After hearing from Macheret and discussing the matter, the board amended the 180–day suspension period recommended by the hearing examiner to a minimum period of one year. In all other respects, the board approved and confirmed the hearing examiner's report.

{¶ 13} Macheret appealed the board's order to the trial court. On September 2, 2009, the trial court issued a judgment affirming the board's order. Macheret now appeals to this court, and he assigns the following errors:

[1.] The Common Pleas Court erred in upholding the Medical Board Order, which was based on the Board's conclusions as to violations for which Dr. Macheret was not given notice or the right to a hearing.

[2.] The Medical Board's disciplinary guidelines did not limit the Medical Board's ability to suspend Dr. Macheret's medical license for less than one year.

[3.] The Medical Board cannot discipline Dr. Macheret for failing to terminate the physician-patient relationship in writing in 2000, when the rule requiring written termination did not take effect until 2006.

{¶ 14} Pursuant to R.C. 119.12, when a trial court reviews an order of an administrative agency, it must consider the entire record to determine whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. If a party appeals the trial court's decision to affirm, reverse, vacate, or modify the agency's order, the appellate court must determine whether the trial court abused its discretion in its examination of the record for reliable, probative, and substantial evidence. *Pons v. Ohio*

*State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748. On questions of law, an appellate court's review is plenary. *Franklin Cty. Sheriff v. Frazier*, 174 Ohio App.3d 202, 2007-Ohio-7001, 881 N.E.2d 345, ¶ 17.

{¶ 15} By his first assignment of error, Macheret argues that the board erred when it increased the sanction that the hearing examiner proposed based on conduct that was not included in the August 9, 2007 notice of intent. Macheret claims that the board's consideration of uncharged conduct deprived him of his due process right to fair notice of all the charges against him. We disagree.

{¶ 16} The uncharged conduct at issue is Macheret's self-professed habit of exchanging hugs and/or air kisses with his patients. Macheret first admitted this conduct in his deposition. At the hearing, when asked whether he had ever kissed Patient 1 in his office, Macheret stated:

> It's like many times I have patients who come to me and we exchange hugs. Many times women or patients kiss me on the cheek usually; but it's like, you know, like air-type of a kiss.

Macheret again mentioned hugging his patients when addressing the board. As reflected in the board minutes, Macheret stated that:

> he has always been a friendly and gregarious physician by training. He hugs his patients in a non-sexual way, and he asks them questions about their lives and their emotional wellbeing. He knows his patients in order to better help them.

{¶ 17} At the conclusion of Macheret's remarks to the board, Dr. Nandlal Varyani, then board president, asked Macheret how he greets his patients today. Macheret replied that "it's the same as usual[;] [h]e still hugs them, and he asks them about their life." Varyani then asked whether Macheret still kisses his patients. Macheret "stated that from time to time they exchange air kisses. It's the Italian or Russian culture."

{¶ 18} When Varyani opened the matter for the board members to comment, Dr. Dalsukh Madia, then board vice president, stated that he believed that Patient 1 was still Macheret's patient when they had sex. Madia also stated that it bothered him that Macheret greets new patients with hugs and kisses. Madia "[didn't] feel that that [was] right, and it may give the wrong impression to some patients, although not to all patients."

{¶ 19} Dr. Carol Egner next spoke. Egner stated that she believed Macheret had lied to the board when he claimed to have terminated the physician-patient relationship with Patient 1 prior to having sex with her. Egner pointed out that Macheret had "messed up" Patient 1's life, and she had no confidence that

Macheret would not engage in the same conduct with another patient. Egner also mentioned Macheret's practice of hugging and kissing his patients:

> He doesn't change his habits of how he deals with patients. He stated that he still hugs them and kisses them. Furthermore, he stated that it's a cultural thing, he's allowed to do it, and he doesn't have to abide by the Board's standards and rules.

{¶ 20} Agreeing with Egner's statements, Dr. Anita Steinbergh opined that Macheret was untruthful when he represented that he had severed the physician-patient relationship. She also stated, "[T]he social thing about hugging and kissing a patient in your office is absolutely inappropriate." For her, the decision to hug a patient presented "a boundary issue," and she hugged only female patients if they were grieving or upset. Steinbergh was also disturbed that Macheret continued to provide care for Patient 1, even after he had supposedly terminated the physician-patient relationship. Steinbergh concluded by proposing a minimum one-year suspension of Macheret's certificate to practice.

{¶ 21} Dr. Darshan Mahajan then stated that Macheret had exceeded the limits of the physician-patient relationship, and he agreed with the hearing examiner's recommendation. Next, Dr. Jack Amato and W. Frank Hairston both expressed approval of Steinbergh's proposal to increase the sanction to a minimum one-year suspension.

{¶ 22} Speaking last, Varyani strongly condemned Macheret's practice of hugging and kissing his patients. As reflected in the board minutes:

> [Varyani] stated that Ohio had sexual misconduct rules in 2003 and 2007. * * * Dr. Varyani stated that those rules may not apply in this case, but, Dr. Macheret admitted today that he still hugs and kisses patients today. Dr. Varyani stated that he doesn't like this idea. * * * [H]e doesn't know how the Board can be more explicit regarding sexual boundaries. Dr. Varyani stated that he would prefer to amend this order to permanent revocation, such revocation being stayed, and a suspension for an indefinite period but not less than one year.

{¶ 23} At the end of Varyani's comments, the board voted to amend the suspension period that the hearing examiner had recommended, extending it from a 180–day period to a minimum one-year period. The board then voted to approve and confirm the hearing examiner's findings of fact, conclusions of law, and proposed order, as amended.

{¶ 24} Both the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution require that administrative proceedings comport with due process. *Mathews v. Eldridge* (1976), 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (considering whether a federal agency accorded

an individual due process before depriving him of a private interest); *Doyle v. Ohio Bur. of Motor Vehicles* (1990), 51 Ohio St.3d 46, 554 N.E.2d 97 (considering whether a state agency complied with due process requirements).[2] Procedural due process requires administrative agencies to provide an individual with fair notice of the precise nature of the charges that the agency will pursue at a disciplinary hearing. *Applegate v. State Med. Bd. of Ohio*, 10th Dist. No. 07AP–78, 2007-Ohio-6384, 2007 WL 4216955, ¶ 23; *Johnson v. State Med. Bd. of Ohio* (Sept. 28, 1999), 10th Dist. No. 98AP–1324, 2000 WL 192374; *In re Morgenstern* (May 28, 1992), 10th Dist. No. 91AP–1018, 1992 WL 119880.

{¶ 25} In *In re Ruffalo* (1968), 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117, the United States Supreme Court held that the Supreme Court of Ohio had violated this fundamental aspect of due process when disbarring an attorney. There, the disciplinary board added a misconduct charge in the midst of the proceedings based on testimony that the attorney gave during the disciplinary hearing. The Supreme Court of Ohio judged the evidence sufficient to sustain the additional charge, and it disbarred the attorney based on the misconduct underlying the charge. The United States Supreme Court found this order of events problematic:

> The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh.

Id. at 551, 88 S.Ct. 1222, 20 L.Ed.2d 117. Consequently, the court held that the "absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived [the attorney] of procedural due process." Id. at 552, 88 S.Ct. 1222, 20 L.Ed.2d 117. See also *Disciplinary Counsel v. Simecek* (1998), 83 Ohio St.3d 320, 322, 699 N.E.2d 933 (holding that the addition of misconduct charges after the record is closed failed to pass the test of procedural due process).

{¶ 26} Macheret relies upon *Ruffalo* to argue that the board deprived him of procedural due process. *Ruffalo,* however, does not apply here. Unlike the disciplinary board in *Ruffalo,* the board did not amend the charges against Macheret to add a charge based on evidence adduced during the hearing. Although board members criticized Macheret's practice of hugging and kissing his patients, the board did not conclude that this uncharged conduct actually violated R.C. 4731.22(B) or board rules. Instead, the board found that the

---

**2.** The "due course of law" aspect of Section 16, Article I of the Ohio Constitution is the equivalent of the Due Process Clause of the United States Constitution. *Groch v. Gen. Motors Corp.,* 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 53.

evidence substantiated the four charges contained in the notice of intent, and it disciplined Macheret solely for the misconduct alleged in the notice of intent.

{¶ 27} While the board did not add charges, it did increase the severity of Macheret's sanction, at least in part, due to his practice of hugging and kissing his patients. However, a disciplinary body may consider aggravating circumstances, including uncharged misconduct, in determining the appropriate sanction for a member who violates the rules of practice. In *Columbus Bar Assn. v. Farmer*, 111 Ohio St.3d 137, 2006-Ohio-5342, 855 N.E.2d 462, the Columbus Bar Association charged an attorney with multiple violations of the Code of Professional Responsibility after he deceived a client. The complaint failed to charge the attorney with any violations arising from the misrepresentations he made to Disciplinary Counsel during an investigation of the complaint the client lodged against him. The Supreme Court of Ohio concluded that because the attorney did not receive prior notice, the misrepresentations to Disciplinary Counsel could not form the basis for finding a rule violation. Id. at ¶ 25. However, "even though due process preclude[d] finding a Disciplinary Rule violation on [the] basis" of the misrepresentations, the court considered the misrepresentations as an aggravating circumstance when deciding what sanction to impose. Id. at ¶ 49. See also *Disciplinary Counsel v. Cox*, 113 Ohio St.3d 48, 2007-Ohio-979, 862 N.E.2d 514, ¶ 43 (considering uncharged misconduct, namely, submitting false statements during the disciplinary process, when enhancing the recommended sanction). Thus, due process does not preclude a disciplinary body from considering uncharged misconduct in determining a suitable sanction.

{¶ 28} Here, the board complied with due process in disciplining Macheret only for the violations charged in the notice of intent. In setting the appropriate sanction for the violations alleged and proven, the board may, as it did, take into account aggravating circumstances, including uncharged misconduct. Accordingly, we conclude that no due process violation occurred, and we overrule Macheret's first assignment of error.

{¶ 29} By his second assignment of error, Macheret argues that the trial court erred in relying on the board's compliance with its disciplinary guidelines as a reason to reject his due process argument. Because we have overruled Macheret's due process argument on other grounds, the second assignment of error is moot, and we need not address it.

{¶ 30} By his third assignment of error, Macheret argues that the board erred in retroactively applying Ohio Adm.Code 4731–27–01 to discipline him for prohibited conduct that occurred prior to the effective date of the rule. We disagree.

{¶ 31} Ohio Adm.Code 4731–27–01(A) lists the requirements a physician must follow in order to terminate a physician-patient relationship. In most circumstances, a physician must mail the patient a letter that includes a statement that the physician-patient relationship is terminated. Ohio Adm.Code 4731–27–01(A)(1). The rule also provides:

A physician's termination of a physician-patient relationship other than in accordance with the provisions of this rule, as determined by the state medical board of Ohio, shall constitute "a departure from, or failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established," as that clause is used in division (B)(6) of section 4731.22 of the Revised Code.

Ohio Adm.Code 4731–27–01(E).

{¶ 32} Macheret allegedly terminated the physician-patient relationship with Patient 1 approximately six years before physicians licensed in Ohio became subject to the requirements of Ohio Adm.Code 4731–27–01. In this appeal, Macheret contends that the board applied Ohio Adm.Code 4731–27–01 retroactively and disciplined him for failing to produce evidence that he had severed the physician-patient relationship with Patient 1 in writing.

{¶ 33} Contrary to Macheret's contention, the board disciplined him for his misrepresentations during the investigatory process, not his failure to follow Ohio Adm.Code 4731–27–01. Macheret stated in his deposition and answers to interrogatories that he had terminated the physician-patient relationship in writing prior to engaging in sexual intercourse with Patient 1. The notice of intent alleged that these statements were false, and it charged Macheret with violations of R.C. 4731.22(B)(5) and (34) for giving the untruthful statements. The board found that the evidence supported the charges, in part, because Macheret could not adduce any evidence of a written termination letter. Aside from his own repeated assertion that a written termination letter existed, Macheret could produce only the testimony of Hemme, his former medical assistant, to prove that his statements were truthful. However, Hemme testified that she mailed Patient 1 two termination letters in September or October 2000—two to three months *after* Macheret and Patient 1 had sex. The board appropriately considered the lack of a written termination letter and Hemme's testimony when gauging the credibility of Macheret's statements and finding that Macheret had lied during the investigation process. Accordingly, we overrule Macheret's third assignment of error.

{¶ 34} For the foregoing reasons, we overrule Macheret's first and third assignments of error, and we find Macheret's second assignment of error moot.

Consequently, we affirm the judgment of the Franklin County Court of Common Pleas.

Judgment affirmed.

McGRATH and CONNOR, JJ., concur.